NATIONAL PETROLEUM MARKETING, INC., a Nevada Corporation; d/b/a Arizona Fuel Terminal; Sunshine Western, Inc., a Nevada Corporation; John Knight II, and Miller Distributing, Inc., a Nevada Corporation, Plaintiffs,

v.

PHOENIX FUEL CO., INC., an Arizona Corporation; d/b/a Firebird Fuel Co. and Mesa Fuel Co. and Tucson Fuel Co.; Jack Keller and Jane Doe Keller, Husband and Wife, William Wilhoit and Jane Doe Wilhoit, Husband and Wife; United Communications Group, Ltd., a Maryland Limited Partnership, d/b/a Oil Price Information Service and Oil Express; Bruce Levenson, Scott Berhang; Julia Blalock; Carol Donoghue; Mary Welge; The United States of America; and John Does 1–35, Defendants.

Civ. No. 95–CV–296W.

United States District Court,
D. Utah.
Central Division.

Oct. 6, 1995.

Tony Rudman, Beus, Gilbert & Morrill, Salt Lake City, UT, Michael E. Gottfried, Richard R. Thomas, Beus, Gilbert & Morrill, Phoenix, AZ, for Plaintiffs.

Robert M. Anderson, Franklin N. Smith, Anderson & Smith, Salt Lake City, UT, D. Gary Christian, Heinz J. Mahler, Kipp & Christian, Salt Lake City, UT, William Ryan, Asst. U.S. Attorney, Salt Lake City, UT, Michael J. Salem, R. Scott Clarke, U.S. Dept. of Justice—Tax Division, Washington, DC, for Defendants.

## MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS FOR LACK OF PERSONAL JURISDICTION

WINDER, Chief Judge.

This matter is before the court on two separate motions to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure: (1) that of defendants Phoenix Fuel Co., Inc. ("Phoenix Fuel"), d/b/a Firebird Fuel Co., Mesa Fuel Co., and Tucson Fuel Co.; Jack Keller ("Mr. Keller") and Jane Doe Keller ("Mrs. Keller"); and William Wilhoit ("Mr. Wilhoit") and Jane Doe Wilhoit ("Mrs. Wilhoit") (collectively "PF Defendants"),[1] and (2) that of defendants United Communications Group, Ltd. ("UCG"), d/b/a Oil Price Information Service ("OPIS") and Oil Express ("Oil Express"); Bruce Levenson ("Levenson"); Scott Berhang ("Berhang"); Julia Blalock ("Blalock"); Carole Donoghue ("Donoghue"); and Mary Welge ("Welge") (collectively "UCG Defendants"). A hearing on these motions was held September 14, 1995. Plaintiffs National Petroleum Marketing, Inc. ("NPM"), d/b/a Arizona Fuel Terminal ("Arizona Fuel") and Sunshine Western, Inc. ("Sunshine Western"); John Knight II ("Knight"); and Miller Distributing, Inc. ("Miller") (collectively "Plaintiffs") were represented by Tony J. Rudman. The PF Defendants were represented by Heinz J. Mahler, while the UCG Defendants were represented by Robert M. Anderson and Franklin N. Smith. Before the hearing, the court considered carefully the memoranda and other materials submitted by the parties. Since taking the matter under advisement, the court has further considered the facts and law presented by the parties, and has also conducted additional research. Now being fully advised, the court enters the following memorandum decision and order.

## I. *STANDARD OF REVIEW*

■ The following standard is applicable to the analysis of the instant motions:

"[t]he plaintiff bears the burden of establishing personal jurisdiction over the defendant. Prior to trial, however, when a motion to dismiss for lack of jurisdiction is decided on the basis of affidavits and other written materials, the plaintiff need only make a prima facie showing. The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits. If the parties present conflicting affidavits, all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie show-

---

1. Jane Doe Keller has been identified as Diana E. Keller, and Jane Doe Wilhoit has been identified as Teresa Wilhoit. *See* Phoenix Fuel Defendants'

Memorandum of Authorities in Support of Motion to Dismiss (July 21, 1995) [hereinafter PF Defendants' Memo.].

ing is sufficient notwithstanding the contrary presentation by the moving party." *Taylor v. Phelan,* 912 F.2d 429, 431 (10th Cir.1990), *cert. denied,* 498 U.S. 1068, 111 S.Ct. 786, 112 L.Ed.2d 849 (1991) (quoting *Behagen v. Amateur Basketball Ass'n,* 744 F.2d 731, 733 (10th Cir.1984) (citations omitted), *cert. denied,* 471 U.S. 1010, 105 S.Ct. 1879, 85 L.Ed.2d 171 (1985)). Furthermore, in determining whether personal jurisdiction is appropriate, an employee's contacts with a jurisdiction "are not to be judged according to their employer's activities there." *Calder v. Jones,* 465 U.S. 783, 790, 104 S.Ct. 1482, 1487, 79 L.Ed.2d 804 (1984). "On the other hand, their status as employees does not somehow insulate them from jurisdiction." *Id.* Instead, "[e]ach defendant's contacts with the forum State must be assessed individually." *Id.* Finally, at this stage of the proceedings, "[t]he [c]ourt is not permitted to inquire into the merits of plaintiffs' claims." *Far West Capital, Inc. v. Towne,* 828 F.Supp. 909, 911 n. 3 (D.Utah 1993), *aff'd,* 46 F.3d 1071 (10th Cir.1995).

## II. *BACKGROUND*

In view of the considerations outlined *supra,* the factual background on which the court must rely in analyzing the merits of the instant motions is as follows.

Plaintiff NPM is a Nevada corporation whose primary business is refining, buying, and selling petroleum products.[2] NPM is also registered to do business in Arizona and Utah. Its principal place of business is located in Provo, Utah, as is its primary financial institution, Key Bank. The Utah office is NPM's site for coordinating its primary business contacts with its suppliers, negotiating its purchase of product inventory, and making many of its general management, financial, and other business decisions. NPM also pays fuel, excise, and income taxes in the state of Utah. In addition, at least two of

NPM's important customers, Valley Oil and Flying J, Inc. ("Flying J"), maintain their principal places of business in Utah.

Plaintiff Knight, a Utah resident, is president and sole shareholder of NPM. In addition to residing with his family in Utah, Knight owns personal and real property in the state, pays resident personal income taxes, and registers his vehicles in Utah.

Defendants Mr. and Mrs. Wilhoit and Mr. and Mrs. Keller are Arizona residents, and defendant Phoenix Fuel is an Arizona corporation conducting business in Arizona.[3] Mr. Wilhoit is president and Mr. Keller is the chief operating officer of Phoenix Fuel, which is one of Plaintiffs' competitors. Phoenix Fuel has no Utah offices, owns no Utah property, and neither conducts business nor has direct sales in that state. Neither the Wilhoits nor the Kellers own property in Utah.

Defendant UCG, a Maryland limited partnership with principal offices in Maryland, provides specialized oil industry information to persons and entities with whom it enters into subscription agreements. The information is provided in various ways, including: (1) through two separately-operated[4] weekly newsletters, OPIS and Oil Express, which provide pricing and other specialized information to businesses, regulators, and others involved in the oil industry, and (2) through the operation of PetroSAT and PetroScan, electronic news services which also provide oil industry information. The information contained in OPIS is an important source of information to those involved in the oil and gas industries, providing critical and timely-updated pricing information of petroleum products. Defendants have not disputed that "[v]irtually all individuals and entities significantly involved in the oil industry are subscribers to the OPIS bulletin." *See* First Amended Complaint at ¶ 24 (Apr. 7, 1995) [hereinafter Amended Complaint]. Petro-

---

**2.** Sunshine Western, a Nevada corporation, is a name under which NPM formerly did business. Miller is a Nevada corporation which conducts business in Arizona and California. NPM also does business in Arizona under the name Arizona Fuel Terminal.

**3.** Phoenix Fuel also does business as Tucson Fuel Company, Firebird Fuel Company, and Mesa Fuel Company.

**4.** Plaintiffs have not disputed Donoghue's testimony that OPIS and Oil Express are separately operated. *See* Affidavit of Carole Donoghue at ¶ 4 (June 22, 1995) [hereinafter Donoghue Aff.].

SAT is operated by members of the OPIS staff, and at the relevant point in time had 1140 subscribers, presumably worldwide. *See* Affidavit of Julia Blalock at ¶ 3 (June 22, 1995) [hereinafter Blalock Aff.]; Affidavit of Robert H. Freedman at ¶ 5 (Sept. 12, 1995) [hereinafter Freedman Aff.]; Affidavit of Bruce Levenson at ¶ 16 (June 22, 1995) [hereinafter Levenson Aff.] (noting UCG's worldwide circulation).

UCG has never had an office in Utah, does not actively solicit subscriptions in Utah, consummates its subscription agreements at its principal offices in Maryland, has never had employees or bank accounts in Utah, and is not registered to do business in that state. UCG concedes, however, that its employees have had past communication with industry and regulatory news sources in the state of Utah via telephone, the mails, facsimile, and Data Transmission Network ("DTN") transmissions of PetroSAT bulletins to Utah subscribers. *See* Levenson Aff. at ¶ 13.

Defendant Levenson, a Maryland resident, is UCG's chief executive officer. Defendant Berhang, a New Jersey resident, is executive editor of OPIS, PetroScan, and PetroSAT, and is also West Coast coverage editor of OPIS. Defendant Blalock, a Maryland resident, is director of the Petroleum Division of OPIS. Defendant Donoghue, a Virginia resident, is the editor and publisher of Oil Express. Defendant Welge, a New Jersey resident, is a reporter for OPIS and for several UCG electronic news services, including PetroSAT.

PetroSAT is available in six different "bulletins," one of which is a news alert called PetroSAT Alerts. PetroSAT Alerts is automatically transmitted over the DTN, a private satellite transmission system, and is received by subscribers via a satellite dish and a dedicated computer terminal installed on their premises. This system is "powered up" at all times and subscribers need do nothing to receive the PetroSAT service on their computer terminals, and in addition can "print" a desired computer screen to hard copy. *See* Affidavit of Merrill Maughan at ¶ 3 (Aug. 4, 1995) [hereinafter Maughan Aff.]. Although the PetroSAT system does not "save" the information that is transmitted daily, subscribers who miss a particular transmission may contact DTN and the missed transmission will be forwarded to the subscriber via facsimile transmission. *Id.* In March of 1995, there were four subscribers to PetroSAT Alerts in Utah. Freedman Aff. at ¶ 6. Valley Oil, an important NPM customer located in Utah, was a PetroSAT subscriber at that time. Maughan Aff. at ¶ 3.

In contrast to PetroSAT, subscribers access PetroScan by making a telephone call to a computer located in UCG's offices in Maryland and connecting to subscriber information services via modem. *See* Freedman Aff. at ¶ 10; Affidavit of Doug Wells at ¶ 3 (Aug. 4, 1995) [hereinafter Wells Aff.]. PetroScan provides information as to current oil and gas prices, oil industry trends, and newsworthy events affecting the oil industry. Flying J, an important NPM customer located in Utah, subscribed to PetroScan at the relevant point in time.[5] Wells Aff. at ¶ 3.

At some time prior to March 14, 1995, defendant Welge researched, wrote, and edited an article entitled "IRS Suspects West Coast Companies of Fuel Tax Cheating" (the "Article"). Affidavit of Mary Welge at ¶ 4 (June 23, 1995). While researching the Article, Welge made a telephone call from New Jersey to an Internal Revenue Service ("IRS") source located in Utah.[6] *Id.* at ¶ 5. Welge has not denied using information obtained from the IRS source in preparing the Article. Welge also received a substantial amount of the "tax evasion" and "inferior fuel products" information used in the Article through contacts with one or another of the PF Defendants. Plaintiffs have not alleged that the PF Defendants had actual contact with Utah when providing information to Welge.

The Article began by stating that "[t]he records of 16 companies have been subpoenaed in connection with a fuel tampering/tax evasion scheme on the West Coast, and a

---

5. The number of Utah subscribers to PetroScan is unclear.

6. The identity of this source is presently unknown.

Grand Jury investigation is underway, authorities have confirmed." It then went on to report that a spokesman for the Criminal Investigation Division of the IRS in Utah had "said the investigation relates to the dealings of several oil companies owned or associated with a man named John Knight." The Article further reported that in 1994 the IRS had asked Utah, Arizona, and Nevada marketers to turn over records of business transactions with several companies, which companies the Article specifically listed. NPM, Arizona Fuel, Sunshine Western, and Miller were named in that list of thirteen, as was "John Knight Companies." The Article later stated that "[i]t's unknown at this time how many of the companies actually participated in the scam, but industry sources believe some of the companies kept changing names in order to cover up their involvement." The Article also referred to "cheaters" and stated that some of the companies were suspected of "cutting low sulfur diesel fuel with a clear blendstock called 'P070,' reselling the cut product as low sulfur diesel fuel, and pocketing any tax paid on the fuel."

On March 14, 1995, the Article was transmitted in a PetroSAT Alert to all subscribers. It was also available via modem on PetroScan. Merrill Maughan, employee and officer of PetroSAT subscriber Valley Oil, became aware of the article on about March 15, 1995, "was shocked," and as a result questioned both Knight's and his companies' honesty and integrity. Maughan Aff. at ¶¶ 4–5. In addition, Flying J employee Doug Wells received the Article via PetroScan and was also shocked and consequently doubtful as to the reputation and integrity of Knight and his companies, including NPM. *See* Wells Aff. at ¶ 4. As a further result of the Article, PetroSource, one of NPM's key suppliers, immediately terminated NPM's $450,-000 credit line.[7] Affidavit of John B. Knight III at ¶¶ 2–3 (Aug. 4, 1995) [hereinafter J.B. Knight Aff.]. As a result of this act, NPM was unable to purchase an adequate supply from PetroSource on a solely cash basis. Finally, Texaco cut off NPM's $300,000 + credit line as a direct result of the Article, thereby affecting NPM's ability to operate in

the marketplace and causing consequent revenue loss. *Id.* at ¶ 5.

On March 15, 1995, Plaintiffs' attorney contacted Donoghue, publisher of Oil Express, and insisted that OPIS cease and desist from publishing any of the allegations contained in the Article. Donoghue made no commitment to cease such publication in the future. On that same day, Plaintiffs' attorneys sent facsimile transmissions and certified letters to defendants Berhang, Blalock, and Donoghue demanding: (1) that there be no further publication of the offending allegations, (2) that an immediate retraction of each allegation be issued in each publication where the Article had appeared, and (3) that Knight be issued an immediate apology. In addition, from March 15 to March 17, 1995, Plaintiffs' attorney contacted Levenson, who declined to intervene with the publishers of OPIS and the other defendants, and who "expressed the view that none of the details contained in the OPIS article were untrue." *See* Amended Complaint at ¶ 33. Plaintiffs have not alleged that further publication of the Article occurred.

On April 3, 1995 Plaintiffs filed the complaint in this action, stating the following causes of action: (1) defamation of plaintiff Knight (all defendants), (2) injurious falsehood (all defendants), (3) negligence (UCG Defendants), (4) interference with contract (all defendants), (5) interference with prospective economic relations (all defendants except the United States), and (6) illegal disclosures of taxpayer return information (United States).

In support of their motion to dismiss, the PF Defendants argue only that exercise of personal jurisdiction is unwarranted because minimum contacts with the state of Utah are lacking and because there is no nexus between the cause of action and any alleged contacts. *See* PF Defendants' Memo. at pp. 3–6; PF Defendants' Reply Memorandum in Support of Motion to Dismiss for Lack of Personal Jurisdiction at pp. 2–4 (Sept. 8, 1995). As a related matter, at the hearing Plaintiffs' counsel verbally agreed to dismiss

---

7. This credit line has been partially reinstated to a $100,000 limit. Plaintiffs allege that this amount is inadequate for NPM's needs. *See* J.B. Knight Aff. at ¶ 4.

Mrs. Keller and Mrs. Wilhoit from this action.

In contrast to the PF Defendants, the UCG Defendants have made numerous arguments opposing the exercise of specific jurisdiction,[8] including the following: (1) there was no purposeful availment of the Utah forum, (2) their actions were insufficient to create a substantial connection to the forum, (3) it is inappropriate to impute specified acts to *all* UCG defendants, and (4) concerning claims two through five, Plaintiffs' complaint does not allege actual injury in Utah.

## III. *DISCUSSION*

■ "To obtain personal jurisdiction over a nonresident defendant in a diversity action, a plaintiff must show that jurisdiction is legitimate under the laws of the forum state *and* that the exercise of jurisdiction does not offend the due process clause of the Fourteenth Amendment." *Far West Capital, Inc. v. Towne*, 46 F.3d 1071, 1074 (10th Cir.1995). In contrast to the exercise of general jurisdiction, the United States Supreme Court has instructed that specific jurisdiction is appropriate only when nonresident contacts with the forum state arise from, or are directly related to, the cause of action. *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414 nn. 8–9, 104 S.Ct. 1868, 1872 nn. 8–9, 80 L.Ed.2d 404 (1984). This court has interpreted these requirements to mean that the evaluation of specific jurisdiction in Utah mandates a three-part inquiry: "(1) the defendant's acts or contacts must implicate Utah under the Utah long-arm statute; (2) a 'nexus' must exist between the plaintiff's claims and the defendant's acts or contacts; and (3) application of the Utah long-arm statute must satisfy the requirements of federal due process." *Harnischfeger Eng'rs, Inc. v. Uniflo Conveyor, Inc.*, 883 F.Supp. 608, 612–13 (D.Utah 1995) (citing *STV Int'l Mktg. v. Cannondale Corp.*, 750 F.Supp. 1070, 1074 (D.Utah 1990); *Far West Capital*, 46 F.3d at 1074). These requirements will be addressed in sequence.

### A. *Utah Long–Arm Statute*

■ Plaintiffs assert that defendants are within the reach of the Utah long-arm statute, arguing that both the UCG and PF Defendants have caused tortious injury within the state. The relevant portion of the Utah long-arm statute provides that:

> Any person … whether or not a citizen or resident of this state, who in person or through an agent does any of the following enumerated acts, submits himself, and if an individual, his personal representative, to the jurisdiction of the courts of this state as to any claim arising from:

. . . . .

> (3) the causing of any injury within this state whether tortious or by breach of warranty.

Utah Code Ann. § 78–27–24 (Supp.1995).

It appears that neither the UCG Defendants nor the PF Defendants specifically dispute that the Utah long-arm statute is implicated here. More importantly, however, the factual background outlined *supra* supports Plaintiffs' contention. First, the injuries alleged in Plaintiffs' claims flow from Welge's Article, which was in turn based on source materials obtained from one or another of the PF Defendants and also from an IRS source located in Utah. Second, the Article was published within the state of Utah via two different UCG publications. Third, at least two of NPM's Utah customers subscribed to these publications and received the Article. Finally, two of NPM's key suppliers terminated substantial credit lines as a direct result of the Article's publication. Accordingly, it is the court's opinion that these facts are sufficient to show the causing of tortious injury within the state, thereby subjecting all defendants to the jurisdiction of Utah courts. *See Berrett v. Life Ins. Co. of the Southwest*, 623 F.Supp. 946, 949–50 (D.Utah 1985) (finding tortious injury prong of Utah long-arm statute broad enough to encompass allegedly defamatory telephone calls made into Utah by defendants located outside Utah).

---

**8.** Plaintiffs do not contend that the court has general jurisdiction over the UCG defendants. *See* Plaintiffs' Memorandum in Opposition to

UCG Defendants' Motion to Dismiss at p. 4 (Aug. 4, 1995) [hereinafter Plaintiffs' Response to UCG].

**1466**

### B. *Federal Due Process Requirement*

It has been noted that "[t]he Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 471–72, 105 S.Ct. 2174, 2181, 85 L.Ed.2d 528 (1985) (citing *International Shoe Co. v. Washington,* 326 U.S. 310, 319, 66 S.Ct. 154, 159–60, 90 L.Ed. 95 (1945)). In this regard, it is well-settled that federal due process will be satisfied if two successive prongs of a test are met. First, the defendant must have "purposefully established 'minimum contacts' in the forum State." *Id.* at 474, 105 S.Ct. at 2183 (citing *International Shoe,* 326 U.S. at 316, 66 S.Ct. at 158). Second, once the minimum contacts prong is satisfied, exercise of jurisdiction must "not offend traditional notions of fair play and substantial justice." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980) (quoting *International Shoe,* 326 U.S. at 316, 66 S.Ct. at 158).

■ Before undertaking a due process analysis, however, the court must resolve an apparent disagreement between the parties regarding a case which is central to any discussion. In this case, *Burt v. Board of Regents of the Univ. of Neb.,* 757 F.2d 242 (10th Cir.), *cert. granted sub nom. Connolly v. Burt,* 474 U.S. 1004, 106 S.Ct. 521, 88 L.Ed.2d 454 (1985), *cert. vacated on grounds of mootness,* 475 U.S. 1063, 106 S.Ct. 1372, 89 L.Ed.2d 599 (1986), the Tenth Circuit held that a single defamatory letter mailed into the forum state by a defendant in a libel action was sufficient to satisfy the minimum contacts prong of the due process test. *Id.* at 244–45. The parties now take diametrically opposing views regarding *Burt.* On the one hand, the UCG Defendants question *Burt*'s viability after the Tenth Circuit's opinion in *Far West Capital, Inc. v. Towne. See* UCG Defendants' Reply Memorandum in Support of Motion to Dismiss for Lack of Jurisdiction at pp. 9–10 (Aug. 14, 1995) [hereinafter UCG Defendants' Reply]. On the other hand, Plaintiffs read *Burt* as holding that "[i]t does not violate due process to

require 'one who intentionally libels another to answer for the truth of his statements in any state where libel causes harm to the victim.'" *See* Plaintiffs' Memorandum in Opposition to Motion to Dismiss of Phoenix Fuel Defendants at p. 8 (Aug. 24, 1995) [hereinafter Plaintiffs' Response to PF Defendants] (quoting *Burt,* 757 F.2d at 245). Thus, whereas the UCG Defendants question whether *Burt* remains good law, Plaintiffs' interpretation would effectively read the minimum contacts prong out of the due process test. In the court's view, neither approach is warranted.

First, *Far West* did not abrogate *Burt.* Instead, it simply recognized that personal jurisdiction based on business torts might require a greater showing of contacts with the forum state than would the tort of libel. *See Far West,* 46 F.3d at 1077–79. *Far West* explained *Burt* as follows:

> In *Burt v. Board of Regents* ... we applied *Calder* to a libel claim. We held that a Nebraska physician who had supervised a plaintiff in a Nebraska residency program had the *requisite minimum contacts with Colorado when he mailed an allegedly defamatory letter to Colorado,* where the plaintiff intended to establish a medical practice. We reasoned that "no *due process notions of fairness* are violated by requiring one who intentionally libels another to answer for the truth of his statements in any state where the libel causes harm to the victim."

*Id.* at 1077 (emphasis added) (quoting *Burt,* 757 F.2d at 245 (emphasis added)). Thus, *Far West* simply restated *Burt*'s reasoning that in libel actions the *fairness prong* of the due process test may be satisfied by very minimal contacts with the forum state. Indeed, "due process is not satisfied by the *quantity* of the contacts with the state, but 'rather upon the *quality* and nature' of the minimum contacts and their relationship to the claim asserted." *Arguello v. Industrial Woodworking Mach. Co.,* 838 P.2d 1120, 1123 (Utah 1992) (quoting *International Shoe,* 326 U.S. at 319, 66 S.Ct. at 160 (emphasis added)).

The *Far West* court implicitly declined, however, to extend *Burt*'s holding to include

business torts. Regarding such torts, the court analyzed several post–*Calder* opinions before concluding that:

> Our review of these post–*Calder* decisions indicates that the *mere allegation* that an out-of-state defendant has tortiously interfered with contractual rights or has committed other business torts that have allegedly injured a forum resident does not necessarily establish that the defendant possesses the constitutionally required minimum contacts. Instead, in order to resolve the jurisdictional question, a court must undertake a particularized inquiry as to the extent to which the defendant has purposefully availed itself of the benefits of the forum's laws.... We therefore examine "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." In addition, we examine the contacts created by the out-of-state defendant in committing the alleged tort.

*Id.* (emphasis added) (citations omitted). In short, *Far West* appears to subscribe to the proposition that libel claims, in contrast to business tort claims, are ones for which "considerations [of fair play and substantial justice] sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *See Burger King*, 471 U.S. at 477, 105 S.Ct. at 2184 (citing as examples *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 780, 104 S.Ct. 1473, 1481, 79 L.Ed.2d 790 (1984) (libel suit); *Calder*, 465 U.S. at 788–89, 104 S.Ct. at 1486–87 (libel suit)).

Likewise, there is no merit in Plaintiffs' statement that "[i]t *does not violate due process* to require 'one who intentionally libels another to answer for the truth of his statements in any state where libel causes harm to the victim.'" · *See* Plaintiffs' Response to PF Defendants at p. 8. *Burt* actually states that "no *due process notions of fairness* are violated by requiring one who intentionally libels another to answer for the truth of his statements in any state where the libel causes harm to the victim." *See Burt*, 757

F.2d at 245 (emphasis added). Given the fact that the *Burt* court had already found minimum contacts when this statement was made, there is no reason to suppose that the minimum contacts prong is a nullity in libel claims. Stated as Plaintiffs have, however, the necessity for considering the minimum contacts prong disappears, leaving only the fairness prong to determine whether due process requirements have been met. This is clearly in error.

### (1) *Minimum Contacts*

The first prong of the due process analysis assesses whether each defendant has sufficient contacts with the forum state. "In judging minimum contacts, a court properly focuses on 'the relationship among the defendant, the forum, and the litigation.'" *Calder*, 465 U.S. at 788, 104 S.Ct. at 1486 (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204, 97 S.Ct. 2569, 2580, 53 L.Ed.2d 683 (1977)). Moreover, "minimum contacts must have a basis in 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State thus invoking the benefits and privileges of its laws.'" *Harnischfeger*, 883 F.Supp. at 614 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958)). The purposeful availment requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." *Burger King*, 471 U.S. at 475, 105 S.Ct. at 2183 (quoting *Keeton*, 465 U.S. at 774, 104 S.Ct. at 1478).

### a. *PF Defendants*

 The defamation claim against the PF Defendants[9] is predicated on communication from defendants in Arizona to Welge in New Jersey during the research phase of the Article. Plaintiffs do not contend that these communications were either initiated or received in Utah. Based on this fact, the PF Defendants argue that there is no basis for the exercise of personal jurisdiction because they "do not have minimum contacts

**9.** The court recognizes that each defendant's contacts must be evaluated separately. However, because it appears that Phoenix Fuel's, Mr. Keller's, and Mr. Wilhoit's contacts are identical, the court's analysis applies to each.

within the state of Utah." *See* PF Defendants' Memo. at p. 6. Plaintiffs, however, cite *Burt* and assert that "[t]he Phoenix Fuel Defendants have intentionally caused harm to Plaintiffs in Utah and should be required to defend themselves in a Utah court." Plaintiffs' Response to PF Defendants at p. 8.

Plaintiffs' argument is not persuasive. As explained *supra, Burt* did not eliminate the minimum contacts requirement in libel actions. Here, there is no allegation that either Phoenix Fuel, Mr. Keller, or Mr. Wilhoit had any contact whatsoever with the forum or any control over the Article's publication in the forum. Furthermore, that the PF Defendants might *foresee* "UCG's republication" of the allegedly defamatory information is also insufficient to establish minimum contacts.

In the court's view, *Burt* is dispositive here. In *Burt,* the court first found intentional contact between the defendant and the forum-one allegedly libelous letter mailed by the defendant into the forum. In the instant case, however, Plaintiffs have not alleged even one contact with the forum by the PF Defendants. Viewed on a "minimum contacts continuum," therefore, the PF Defendants do not even place. Indeed, it is not alleged that the PF Defendants either wrote or edited the Article, were paid, took actions to inject themselves into the forum, solicited Welge's contacts, or sent materials into Utah.

A "foreseeability of republication" argument is also without merit. The "foreseeability of causing *injury* in another State" is "not a 'sufficient benchmark' for exercising personal jurisdiction." *Burger King,* 471 U.S. at 474, 105 S.Ct. at 2183 (citing *World–Wide Volkswagen,* 444 U.S. at 295, 100 S.Ct. at 566). "Instead, 'the foreseeability that is critical to due process analysis . . . is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'" *Id.* (citing *World–Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. at 567).

A case with a similar factual background is instructive. In *Madara v. Hall,* 916 F.2d 1510 (11th Cir.1990), the defendant, entertainer Daryl Hall, gave a telephone interview from New York to a reporter in California. *Id.* at 1513. The allegedly libelous interview was then published in *Music Connection* magazine. *Id.* Plaintiff subsequently filed suit against the defendant in Florida, and later asserted that *Keeton* governed the case's personal jurisdiction/due process analysis. The court disagreed. *Id.* at 1518. In its reasoning, the court noted that: (1) giving the interview to a reporter in California was not enough to cause the defendant to anticipate being haled into a Florida Court, (2) defendant was not the magazine's publisher and did not control its circulation and distribution, and (3) defendant's awareness—if he was aware—"that a small number of copies of magazines might find their way to Florida [was] not enough to justify the exercise of personal jurisdiction." *Id.* at 1519.

When viewed in the context of *Madara* and *Burt,* it is evident that the PF Defendants did not purposefully avail themselves of the Utah forum. Indeed, minimum contacts can be formed only by "*an action of the defendant purposefully directed toward the forum State.*" *Asahi Metal Ind. Co., Ltd. v. Superior Court of Cal.,* 480 U.S. 102, 112, 107 S.Ct. 1026, 1032, 94 L.Ed.2d 92 (1987) (citing *Burger King,* 471 U.S. at 476, 105 S.Ct. at 2184; *Keeton,* 465 U.S. at 774, 104 S.Ct. at 1478). Accordingly, even under *Burt's* relaxed minimum contacts standard for libel actions, the minimum contacts prong of the due process analysis is unsatisfied as to the defamation claim.

Furthermore, since even a defamation claim's minimum contacts showing cannot be met, it is evident that there is no basis for finding specific jurisdiction as to the remaining tort claims. The court therefore finds that the requisite minimum contacts showing has not been met in connection with these claims.

*b. UCG Defendants*

The UCG Defendants' argument can be divided into two parts: (1) issues related to UCG and Welge, and (2) issues related to all other individual defendants.

■ First, it is argued that the individual defendants other than Welge did not pur-

posefully avail themselves of the forum because they did not: (1) participate in researching or writing the Article, (2) participate in the decision to transmit the Article, or (3) initiate contacts themselves with the forum, receiving such contacts only after the fact. *See* UCG Defendants' Memorandum in Support of Motion to Dismiss for Lack of Jurisdiction at pp. 15–17 (June 26, 1995) [hereinafter UCG Defendants' Memo]. In opposition, Plaintiffs point to the "effects test" of *Calder*. *See* Plaintiffs' Response to UCG Defendants at pp. 5–8. They contend that because Utah was the focus of both the Article and the harm suffered, "[j]urisdiction is appropriate based on the 'effects' of defendants' New Jersey conduct in Utah." *Id.* at p. 6. *Burt* and *Berrett v. Life Insurance Co. of the Southwest* are cited as support for this argument.

Again, Plaintiffs' argument ignores the minimum contacts prong of the due process requirement. Whereas the defendants in both *Burt* and *Berrett* had contact with the forum, there is no evidence here of any such intentional contact. *See Burt*, 757 F.2d at 243 (defendant mailed libelous letter to forum); *Berrett*, 623 F.Supp. at 947 (defendants made defamatory telephone calls from Texas to forum). In this case, defendant Levenson had "no prior knowledge of or personal involvement in the development and transmission of the Article." Levenson Aff. at ¶ 17. Berhang was not personally involved in writing, editing, or transmitting the Article, and was not aware of it prior to its distribution. Berhang Aff. at ¶ 6. Blalock was not aware of the Article prior to its publication, is not responsible for editorial review of articles in PetroSAT bulletins, and did not personally participate in writing, editing, or distributing the Article. Blalock Aff. at ¶ 3. Donoghue, the editor and publisher of Oil Express,[10] had no personal involvement with researching, writing, editing, distributing, or reviewing the Article. Donoghue Aff. at ¶ 5. In fact, although OPIS articles sometimes appear in Oil Express, OPIS and Oil Express are separately operated. *Id.* at ¶ 4. Furthermore, there is no allegation that the Article ever appeared in Oil Express. Final-

ly, any communication with these defendants was initiated by Plaintiffs after the fact.

Based on these facts, exercise of personal jurisdiction over these defendants would contravene the rule that an employee's contacts with a jurisdiction "are not to be judged according to their employer's activities there." *See Calder*, 465 U.S. at 790, 104 S.Ct. at 1487. Accordingly, as with the PF Defendants, the court finds that there was no purposeful availment of the forum by defendants Levenson, Berhang, Blalock, and Donoghue on either the defamation or other tort claims.

■ Second, it is argued that there was no purposeful availment of the forum by Welge and UCG because: (1) neither knew that there would be greater interest in the Article in Utah, (2) reference to Plaintiffs was "incidental" to the "larger story," and the Article was only of "general interest to the readers," (3) there is no evidence that the Article was actually received and read by anyone in Utah as a result of UCG's transmission, and (4) there is no substantial connection to the forum due to the minimal percentage of Petro-SAT's and PetroScan's subscribers and revenues in Utah. In opposition, Plaintiffs point to *Burt*, *Berrett*, and *Anselmi v. Denver Post, Inc.*, 552 F.2d 316 (10th Cir.), *cert. denied sub nom. Times Mirror Co. v. Anselmi*, 432 U.S. 911, 97 S.Ct. 2960, 53 L.Ed.2d 1084 (1977), and argue that the UCG Defendants' intentional conduct has caused damage to Knight and NPM in the forum.

The court is persuaded by Plaintiffs' argument for several reasons. First, the Petro-SAT and PetroScan transmissions were received and read in Utah. Second, it appears that references made in the Article to Knight and his companies were not merely incidental to the larger story. The Article stated that a spokesman for the Criminal Investigation Division of the IRS in Utah had "said the [tax evasion] investigation relates to the dealings of several oil companies owned or associated with a man named John Knight." Knight is a Utah resident and NPM maintains its principal place of business in that state. Based

---

10. The complaint identifies Donoghue as publisher of OPIS. *See* Amended Complaint at ¶ 31.

on this, Welge and UCG could reasonably foresee being haled into a Utah court.

More importantly, however, there is no merit to the argument that the small number of UCG subscribers and revenues attributable to Utah is insufficient to create a substantial connection to the forum.[11] Indeed, reliance on the cases cited in support of this argument is misplaced.

For example, *STV International Marketing v. Cannondale Corp.* looked to the percentage of total sales in the state when evaluating whether such contacts were sufficient to justify *general*, not specific, jurisdiction. *See STV International,* 750 F.Supp. at 1073. Furthermore, *Arguello v. Industrial Woodworking Machine Co.* does not exactly support the statement that " 'it was wholly unforeseeable' that a defendant who only derived .03% of revenues from Utah sales would be subject to specific jurisdiction." *See* UCG Defendants' Memo. at p. 23. In *Arguello,* an allegedly defective finger jointing machine was originally sold in California in 1971 and, in some unknown way, had "found" its way to Utah by 1982. *Arguello,* 838 P.2d at 1121. In finding insufficient contacts to support personal jurisdiction, the court first pointed out that "the contacts of the out-of-state defendant are unrelated to plaintiff's claims, and the claim cannot be said to 'arise out of' the contacts with the state." *Id.* at 1124. Next, the court considered whether the allegedly defective machine had been placed in the stream of commerce "so as to establish sufficient minimum contacts with the place where it ultimately was found-Utah." *Id.* (noting that "[i]n products liability cases, the United States Supreme Court has recognized [this] theory as being sufficient to establish minimum contacts regardless of the result of an 'arising under' analysis"). Rejecting this basis for jurisdiction, the court stated:

Here, Industrial could not have reasonably anticipated being haled into court in Utah because it sold no finger jointing machines in Utah and it did not seek to serve the Utah market for finger jointing machines through either sales representatives or advertising. In addition, Utah accounts for 0.3 percent of Industrial's total sales, and these are almost exclusively sales of parts which are initiated by requests from Utah businesses. It was wholly unforeseeable that Industrial would be subject to a suit in Utah involving a finger jointing machine.

*Id.* at 1125. Clearly, *Arguello* is distinguishable from the purposeful contacts established by UCG and Welge.

Nor are the media cases used to support this argument persuasive. As just one example, *New York Times Co. v. Connor,* 365 F.2d 567 (5th Cir.1966), relies heavily on the proposition that First Amendment concerns surrounding newspaper libel mandate a greater showing of contacts in the forum state. *See id.* at 572. This approach has been explicitly rejected by the Tenth Circuit. *American Land Program, Inc. v. Bonaventura Uitgevers Maatschappij, N.V.,* 710 F.2d 1449, 1453 (10th Cir.1983) (citing *Anselmi,* 552 F.2d at 324, and noting rejection of *Connor*'s position). More importantly, it has been rejected by the United States Supreme Court:

We also reject the suggestion that First Amendment concerns enter into the jurisdictional analysis. The infusion of such considerations would needlessly complicate an already imprecise inquiry. Moreover, the potential chill on protected First Amendment activity stemming from libel and defamation actions is already taken into account in the constitutional limitations on the substantive law governing such suits.

---

11. Even if there were merit to this contention, it might be argued that UCG's circulation and revenues in the state of Utah are not minimal in view of proportionality and the entire oil industry/UCG scenario. For example, in *Curtis Publishing Co. v. Golino,* 383 F.2d 586 (5th Cir.1967) (en banc), the court found that 1% circulation in Louisiana was significant. *Id.* at 591. It reached this conclusion because in 1964 Louisiana accounted for only 1.5% of total United

States population, and the 1% circulation was "as much as could be reasonably anticipated from the Louisiana market." *Id.*

In this case, it has not been disputed that PetroSAT and PetroScan report only specialized oil industry information, that virtually all of those involved in the oil industry subscribe to OPIS (presumably including in Utah), and that PetroSAT is circulated, presumably worldwide, to only 1140 subscribers.

*Calder,* 465 U.S. at 790, 104 S.Ct. at 1487 (citations omitted).

Another cited example, *Church of Scientology of California v. Adams,* 584 F.2d 893 (9th Cir.1978), is distinguishable from the instant case,[12] does not clearly support the UCG Defendants' argument, and has even been explicitly distinguished by a California court as belonging to a time when the law was less flexible and less broad.[13] *See Edwards v. Pulitzer Publishing Co.,* 716 F.Supp. 438, 442 (N.D.Cal.1989).

In this case, Welge intentionally contacted an IRS source in the forum seeking information. Using this information, she wrote and edited the allegedly libelous Article. UCG then intentionally sent the Article into the forum to its subscribers. "[R]egular circulation of magazines in the forum State is sufficient to support an assertion of jurisdiction in a libel action based on the contents of the magazine." *Keeton,* 465 U.S. at 773–74, 104 S.Ct. at 1477–78. Furthermore, this case resembles *Anselmi,* wherein the court found that sending only a few copies of a newspaper into a state could establish jurisdiction when it was foreseeable that a story would be given substantial attention in that state. *Anselmi,* 552 F.2d at 325. In sum, both UCG and Welge could reasonably foresee being haled into court in Utah, thereby establishing minimum contacts as to the defamation claim.

Finally, in opposing jurisdiction over the non-defamation claims, the UCG Defendants argue additionally that Plaintiffs must allege actual injury or loss in Utah, and not just loss of profits or goodwill. They also cite *Harnischfeger* and *Far West* in support of the argument that "mere allegation of financial loss by the plaintiff in the forum state is [in]sufficient to satisfy the 'minimum contacts' standard." *See* UCG Defendants' Reply at p. 8.

These cases are unpersuasive under the facts of the instant case. First, the *Harnischfeger* quote used by the UCG Defendants to support their argument is part of that case's analysis of the Utah long-arm statute, not its minimum contacts analysis. *See Harnischfeger,* 883 F.Supp. at 613. Second, the *Far West* facts are distinguishable. In *Far West*—which was essentially a contract dispute—Utah was the domicile of the plaintiff corporation, but the allegedly tortious acts were centered in Nevada. Regarding Utah, the court noted that "there is no indication that Utah had anything but a fortuitous role in the parties' past dealing or would have any role in their continuing relationships." *Far West,* 46 F.3d at 1080. In short, "[t]here [was] thus no evidence that defendants' alleged torts had any connection to Utah beyond plaintiff's corporate domicile." *Id.*

Here, however, the claims do not relate narrowly to disputes regarding specific contractual agreements or to NPM's loss of profits, but relate instead to NPM's ability to

---

**12.** In *Church of Scientology,* a series of allegedly libelous articles discussing Scientology generally, and making particular reference to the Church of Scientology of Missouri, appeared in a Missouri newspaper. *Church of Scientology,* 584 F.2d at 895. Shortly after publication, the California Church filed suit in California against the articles' publishers and authors. *Id.* Circulation of the newspaper in California amounted to only .04% of its total circulation. *Id.* at 896. In dismissing the action, the court cited *Anselmi* and first acknowledged that "[u]nder some circumstances a publisher could be held to a duty to anticipate injury to reputation from distribution of a small number of copies." *Id.* at 898. In its own case, however, the court found that it was not reasonably foreseeable that harm would result because:

> In the present appeal, California events were not the topic of the allegedly actionable writings, nor were California readers a principal or

secondary target of the articles. No research was done in California and the articles were not written in that state. The only mention of a California resident was by way of reference to a person who spoke as a representative of the national Scientology organization. The California Church is a separate corporation, and it was not mentioned in any of the articles. *Id.*

**13.** In *Edwards,* the court referred to *Church of Scientology* and noted that circulation "is not the sole criteria by which this Court should determine minimum contacts." *Edwards,* 716 F.Supp. at 442. The court then pointed out that the law had become more flexible and broad since *Church of Scientology* was decided, and went on to find that certain intentional contacts, coupled with minimal circulation, satisfied the minimum contacts prong of the due process test. *Id.*

operate its business in light of the allegedly defamatory Article. Nor are the contacts established by Welge and UCG either fortuitous or attenuated. NPM customers Valley Oil and Flying J have both stated that the Article caused them to doubt the reputation, honesty, and integrity of Knight and NPM. *See* Maughan Aff. at ¶¶ 4–5; Wells Aff. at ¶ 4. In addition, substantial credit lines were terminated as a result of the Article. In view of the fact that Plaintiffs need only make a prima facie showing of jurisdiction, as well as the fact that the merits of Plaintiffs' claims must not be inquired into at this time, the court also finds justification for the exercise of jurisdiction over these claims.

### (2) Fairness Considerations

The following factors are relevant in determining whether asserting jurisdiction over a non-resident of the forum comports with considerations of fair play and substantial justice: " '(1) the burden on the defendant; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies.' " *Harnischfeger*, 883 F.Supp. at 615–16 (quoting *DeMoss v. City Market, Inc.*, 762 F.Supp. 913, 919–20 (D.Utah 1991) (citations omitted)). As the United States Supreme Court has noted concerning these factors:

> These considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required. On the other hand, where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.

*Burger King*, 471 U.S. at 477, 105 S.Ct. at 2184–85 (citations omitted). "[J]urisdictional rules [however,] may not be employed in such a way as to make litigation 'so gravely difficult and inconvenient' that a party un-

fairly is at a 'severe disadvantage' in comparison to his opponent." *Id.* at 478, 105 S.Ct. at 2185 (quoting *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 18, 92 S.Ct. 1907, 1917, 32 L.Ed.2d 513 (1972) (re forum-selection provisions); *McGee v. International Life Ins. Co.*, 355 U.S. 220, 223–24, 78 S.Ct. 199, 201–02, 2 L.Ed.2d 223 (1957)).

It appears that the UCG Defendants argue only that litigation in Utah would be unfair to the individual defendants. *See* UCG Defendants' Memo. at p. 24. Thus, it is apparently conceded that it would not be unfair to require UCG to litigate in Utah. This analysis therefore applies only to Welge since she is the sole individual defendant with the requisite minimum contacts with the forum. Furthermore, the analysis as to the defamation claim is dispositive of all claims against Welge.

The reason given for opposing this court's exercise of jurisdiction over Welge is that requiring her to litigate in Utah would "pose significant personal and economic burdens." *Id.* Reasons supporting jurisdiction are as follows: (1) Utah has considerable interest in protecting its citizens from injury caused by defamation and libel, (2) since UCG will litigate in the forum, most of the evidence and witnesses will already be located there, and (3) litigation in the forum serves Plaintiffs' interests in obtaining convenient and effective relief. Most importantly, however, "no due process notions of fairness are violated" by requiring defendant Welge to litigate a defamation claim in Utah. *See Burt*, 757 F.2d at 245. Accordingly, in view of *Burt* as well as the considerations outlined *supra* in *Burger King*, the court finds that asserting jurisdiction over both Welge and UCG does not offend "traditional notions of fair play and substantial justice."

### C. Nexus Requirement

The final issue to be addressed is whether a sufficient nexus exists between Plaintiffs' claims and UCG's and Welge's contacts with Utah. This court has concluded that "the 'nexus' requirement should be construed narrowly to require that the plaintiff's claims must 'arise from'—not merely 'relate to'—the defendant's contacts with Utah." *Harnischfeger*, 883 F.Supp. at 617.

Applying this standard, it is clear that Plaintiffs' claims arise from Welge's and UCG's contacts with the forum. Welge received information included in the Article from a forum source, and wrote the article about forum residents. UCG then sent the allegedly tortious Article into the forum. The nexus requirement is therefore met.

## IV. ORDER

For the foregoing reasons, and good cause appearing, IT IS HEREBY ORDERED as follows:

1. Defendants Phoenix Fuel Co., Inc. d/b/a Firebird Fuel Co., Mesa Fuel Co., and Tucson Fuel Co.; Jack Keller; Jane Doe Keller a/k/a Diane E. Keller; William Wilhoit; Jane Doe Wilhoit a/k/a Teresa Wilhoit; Bruce Levenson; Scott Berhang; Julia Blalock; and Carole Donoghue's motions to dismiss for lack of personal jurisdiction are hereby GRANTED.

2. Defendants United Communications Group, Ltd. d/b/a Oil Price Information Service and Oil Express, and Mary Welge's motions to dismiss for lack of personal jurisdiction are hereby DENIED.

3. Defendants United Communications Group, Ltd. d/b/a Oil Price Information Service and Oil Express, and Mary Welge shall respond to Plaintiffs' amended complaint within fifteen (15) days from the date of this Order.

4. This Order will suffice as the court's action on these motions and no further order need be prepared by counsel.