**Stephen BARRETT, M.D., Plaintiff,**

**v.**

**The CATACOMBS PRESS, James R. Privitera, M.D., Alan Stang, M.A., Darlene Sherrell, and CDS Networks Inc., Defendants.**

**No. Civ. 99–736.**

United States District Court,
E.D. Pennsylvania.

April 12, 1999.

Steven A. Bergstein, Allentown, PA, for plaintiff.

Malcolm J. Gross, Allentown, PA, Charles W. Elliott, Easton, PA, Barbara R. Binis, Philadelphia, Pa, for defendants.

## *OPINION AND ORDER*

### I. INTRODUCTION

VAN ANTWERPEN, District Judge.

Plaintiff Stephen Barrett filed this action under Pennsylvania's defamation law, against Defendants the Catacombs Press, James R. Privitera, Alan Stang, Darlene Sherrell and CDS Network, Inc. We have jurisdiction over this diversity action pursuant to 28 U.S.C. § 1332.

Defendant Darlene Sherrell has independently moved to dismiss this suit pursuant to Fed.R.Civ.P. 12(b)(2) for lack of personal jurisdiction. We have reviewed the record and conclude that for the following reasons, this court cannot exercise personal jurisdiction over Defendant Darlene Sherrell.

### II. FACTS

Plaintiff in this case is a resident and psychiatrist in Allentown, Pennsylvania. Decl. Barrett 3/5/99 at ¶¶ 1–2. Since 1969, he has been involved in investigating and dealing with many aspects of quackery, health frauds, misinformation and consumer strategy. *Id.* at ¶ 4. He has also been responsible for writing, co-authoring or editing over 200 publications relating to consumer health. *Id.* Since December 1996, Plaintiff has maintained a computer Web site called Quackwatch, which provides information about quackery, health frauds and consumer decisions. *Id.* at ¶ 6. Plaintiff's Web site has received international acclaim, with more than fifty awards and/or favorable mentions in newspapers,

magazines and journals throughout the world.

Only about 1% of the Quackwatch Web site addresses the fluoridation debate through its "Fluoridation: Don't Let the Poisonmongers Scare You" page. *Id.* at ¶ 7. This Web site also provides hypertext links to other Web sites that promote fluoridation of public water sources. Decl. Sherrell 4/2/99 at ¶ 4. Although Plaintiff has participated in these activities and has edited a book and a few articles that men-

tion fluoridation, he claims that he has not been involved in promoting fluoridation nationally. Decl. Barrett 3/5/99 at ¶ 5.

Plaintiff first became aware of the existence of Defendant Sherrell, a resident of Oregon, after she joined the health fraud discussion group co-sponsored by the Quackwatch Web site, which has 300 members from across the country.[1] *Id.* at ¶¶ 8–9. She joined the discussion list by posting a message on-line for view by the

---

1. The discussion in *ACLU v. Reno*, 929 F.Supp. 824, 834–35 (E.D.Pa.1996), aff'd, 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997), is instructive:

 24. *One-to-many messaging.* The Internet also contains automatic mailing list services (such as "listservs"), [also referred to by witnesses as "mail exploders"] that allow communications about particular subjects of interest to a group of people. For example, people can subscribe to a "listserv" mailing list on a particular topic of interest to them. The subscriber can submit messages on the topic to the listserv that are forwarded (via e-mail), either automatically or through a human moderator overseeing the listserv, to anyone who has subscribed to the mailing list. A recipient of such a message can reply to the message and have the reply also distributed to everyone on the mailing list. This service provides the capability to keep abreast of developments or events in a particular subject area. Most listserv-type mailing lists automatically forward all incoming messages to all mailing list subscribers. There are thousands of such mailing list services on the Internet, collectively with hundreds of thousands of subscribers. Users of "open" listservs typically can add or remove their names from the mailing list automatically, with no direct human involvement. Listservs may also be "closed," *i.e.*, only allowing for one's acceptance into the listserv by a human moderator.

 25. *Distributed message databases.* Similar in function to listservs—but quite different in how communications are transmitted—are distributed message databases such as "USENET newsgroups." User-sponsored newsgroups are among the most popular and widespread applications of Internet services, and cover all imaginable topics of interest to users. Like listservs, newsgroups are open discussions and exchanges on particular topics. Users, however, need not subscribe to the discussion mailing list in advance, but can instead access the database at any time. Some USENET newsgroups are "moderated" but most are open access. For the moderated newsgroups, all messages to the newsgroup are forwarded to one person who can screen them for relevance to the topics under discussion. USENET newsgroups are disseminated using ad hoc, peer to peer connections between approximately 200,-000 computers (called USENET "servers") around the world. For unmoderated newsgroups, when an individual user with access to a USENET server posts a message to a newsgroup, the message is automatically forwarded to all adjacent USENET servers that furnish access to the newsgroup, and it is then propagated to the servers adjacent to those servers, etc. The messages are temporarily stored on each receiving server, where they are available for review and response by individual users. The messages are automatically and periodically purged from each system after a time to make room for new messages. Responses to messages, like the original messages, are automatically distributed to all other computers receiving the newsgroup or forwarded to a moderator in the case of a moderated newsgroup. The dissemination of messages to USENET servers around the world is an automated process that does not require direct human intervention or review.

 26. There are newsgroups on more than fifteen thousand different subjects. In 1994, approximately 70,000 messages were posted to newsgroups each day, and those messages were distributed to the approximately 190,000 computers or computer networks that participate in the USENET newsgroup system. Once the messages reach the approximately 190,000 receiving computers or computer networks, they are available to individual users of those computers or computer networks. Collectively, almost 100,000 new messages (or "articles") are posted to newsgroups each day.

entire discussion group. In the Plaintiff's opinion, when the volume of messages posted became sufficiently large to be unproductive, he posted a message to that effect which was disseminated to the entire discussion group. *Id.* at ¶ 9. Ms. Sherrell, however, claims that she simply posted one message to the list and that the remainder of her postings were responses to other participants' postings. Decl. Sherrell 4/2/99 at ¶ 5. She then apparently attempted to engage Plaintiff in a private e-mail discussion about fluoridation. Decl. Barrett 3/5/99 at ¶ 9.

Subsequently, the alleged defamatory statements appeared on Defendant's Web site. *Id.* at ¶ 10. Plaintiff sent her an e-mail threatening a lawsuit after seeing her Web site. *Id.* Defendant responded by making some modifications to her Web site and informing Plaintiff of this action via e-mail. *Id.* at ¶ 11. Plaintiff claims that such modifications made it clear that she was quoting from Mr. Privitera's book, which is available worldwide. Decl. Sherrell 4/2/99 at ¶ 6.

Plaintiff also alleges that Defendant subsequently posted messages with a hypertext link back to her Web site on several listserves or USENET discussion groups including: (1) a Dental Public Health list maintained by a computer at the University of Pittsburgh, which has national distribution; (2) to the owner of the Chiro–List which has about 350 chiropractors across the country; (3) at "sci.med.dentistry"; (4) at "misc.health.alternative," a USENET group that is believed to have tens of thousands of participants; and (5) at "misc.kids.health," a USENET news group that probably has thousands of participants. Decl. Barrett 3/5/99 at ¶¶ 12–21. In December, Defendant opened another Web site which Plaintiff alleges is dedicated to "attacking me and several colleagues." *Id.* at ¶ 22. Plaintiff alleges that he has "good reason to believe that she posted a total of at least 90 messages

to at least 12 USENET news groups, with total membership in the tens of thousands, and that many of these messages encouraged people to visit one or more [of] her sites that contained defamatory statements about me." *Id.* at ¶ 23. Plaintiff, however, has not offered any evidence to support this allegation.

Defendant is closely associated with individuals who are interested in advocating against the fluoridation of water sources throughout the United States. *Id.* at ¶ 27. Defendant states that she has never been physically present in the Commonwealth of Pennsylvania except to pass through the state a few times, more than ten years ago.[2] Decl. Sherrell 2/18/99 at ¶ 6. She also alleges that the information which she has posted on the World Wide Web "was not targeted to the Commonwealth of Pennsylvania" and that her activity was part of a larger public debate on fluoridation issues. *Id.* at ¶¶ 8–11; *see also* Decl. Sherrell 4/2/99 at ¶¶ 9–10.

## III. DISCUSSION

Defendant Darlene Sherrell has moved to dismiss Plaintiff's Complaint pursuant to Fed.R.Civ.P. 12(b)(2) by arguing that this court lacks personal jurisdiction. When a motion to dismiss under Fed. R.Civ.P. 12(b)(2) is filed, the burden falls upon the plaintiff to come forward with sufficient facts to establish a prima facie case in favor of personal jurisdiction. *Carteret Savings Bank, FA v. Shushan,* 954 F.2d 141, 146 (3d Cir.1992). To the extent that a defendant files opposing affidavits or depositions, a plaintiff may not rest on mere allegations in the complaint but must support such jurisdictional allegations with appropriate affidavits or other evidence. *See Time Share Vacation Club v. Atlantic Resorts, Ltd.,* 735 F.2d 61, 66–67 n. 9 (3d Cir.1984). Any conflict of facts between the plaintiff and defendant are to be resolved in favor of the plaintiff. *TJS Brokerage & Co., Inc. v. Mahoney,* 940

---

2. Defendant was involved in a major fluoridation case in Pennsylvania in the late 1970's and the early 1980's. Decl. Barrett 3/5/99 at ¶ 29.

F.Supp. 784, 787 (E.D.Pa.1996); *Di Mark Mktg., Inc. v. Louisiana Health Serv. & Indemnity Co.,* 913 F.Supp. 402, 405 (E.D.Pa.1996).

■ The applicable law has been stated many times. Pursuant to Fed.R.Civ.P. 4(e), federal courts are authorized to exercise personal jurisdiction over a nonresident to the extent permitted by law of the state where the action is brought. *Provident Nat'l Bank v. California Fed. Sav. & Loan Ass'n,* 819 F.2d 434, 436 (3d Cir. 1987). Federal courts follow a two-step analysis to determine if personal jurisdiction is proper: (1) if jurisdiction is proper under the forum's long-arm statute; and (2) the exercise of personal jurisdiction over the defendant comports with due process under the U.S. Constitution.

■ Accordingly, we look to the Pennsylvania Long–Arm Statute, 42 Pa.C.S.A. § 5322, to determine whether facts or circumstances exist to require the defendants to answer in this forum. Section 5322(a)(4) states that the long-arm statute extends to a person who causes "harm or tortious injury by an act or omission in this Commonwealth." It also states that personal jurisdiction "shall extend to all persons ... to the fullest extent allowed under the Constitution of the United States and may be based on the most minimum contact with this Commonwealth allowed under the Constitution of the United States." 42 Pa.C.S.A. § 5322(b). Thus, the two-step inquiry collapses into one coextensive with the due process clause of the United States Constitution because "[t]he Pennsylvania statute permits the courts of that state to exercise personal jurisdiction over nonresident defendants to the constitutional limits of the due process clause of the fourteenth amendment." *See, e.g., Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino,* 960 F.2d 1217, 1221 (3d Cir.1992); *Empire Abrasive Equipment v. H.H. Watson, Inc.,* 567 F.2d 554, 556 n. 1 (3d Cir.1977).

■ General jurisdiction permits a court to exercise personal jurisdiction over a nonresident defendant when "that party can be called to answer any claim against her, regardless of whether the subject matter of the cause of action has any connection to the forum." *Mellon Bank,* 960 F.2d at 1221. General jurisdiction can even be exercised over non-forum related activities when the defendant has engaged in "systematic and continuous" activities in the forum state, *see Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 414–16, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). On the other hand, specific jurisdiction arises when the relationship between "the defendant, the cause of action, and the forum falls within the 'minimum contacts' framework first announced in *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and later refined by the abundant progeny of that landmark case." *Mellon Bank,* 960 F.2d at 1221.

■ We agree with the Defendant that general jurisdiction is clearly inapplicable in this case. General jurisdiction is normally invoked when a defendant has "systematic and continuous" contacts with the forum state, which include participating in a consecutive series of activities from within the forum state. In *Helicopteros Nacionales,* for example, the Court denied general jurisdiction, finding that the defendant did not have sufficient "systematic and continuous" contact with the forum state, although it had purchased millions of dollars worth of products, negotiated a contract and even trained employees from within the forum state. 466 U.S. at 418, 104 S.Ct. 1868. These contacts must be "so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities." *International Shoe,* 326 U.S. at 318, 66 S.Ct. 154. Although Plaintiff attempts to argue that the Defendant's activities on the Web which were nationally accessible amounted to "systematic and continuous contact"

with Pennsylvania, they do not cite any cases supporting this proposition. If anything, the Third Circuit has consistently held that national publications do not constitute "continuous and substantial contacts" with the forum state. *Gehling v. St. George's Sch. of Medicine, Ltd.,* 773 F.2d 539, 542 (3d Cir.1985); *Reliance Steel Prods. Co. v. Watson, Ess, Marshall & Enggas,* 675 F.2d 587, 589 (3d Cir.1982). We conclude that the Defendant does not have "systematic and continuous" contacts with Pennsylvania and Plaintiff has not produced sufficient evidence to meet this high threshold.

 As specific jurisdiction applies in the present case, we need to examine whether the "minimum contacts" exist that are purposefully aimed at the forum state. In order to comport with due process, a nonresident defendant must have sufficient minimum contacts with the forum state so "that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe,* 326 U.S. at 316, 66 S.Ct. 154 (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)). Physical presence is no longer necessary to establish minimum contacts for the purposes of personal jurisdiction. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). A court generally applies two standards in deciding whether the minimum contacts test has been met for specific jurisdiction. First, the plaintiff must show that the "defendant had the minimum contacts with the forum necessary for the defendant to have 'reasonably anticipate[d] being haled into court there.'" *Pennzoil Prods. Co. v. Colelli & Associates,* 149 F.3d 197, 201 (3d Cir.1998) (quoting *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). Important factors in determining whether this test has been met are the quality of the contacts between the forum, the defendant and the litigation, *see Shaffer v. Heitner,* 433 U.S. 186, 204, 97 S.Ct. 2569, 53 L.Ed.2d 683

(1977), and whether the cause of action flows from the contacts and whether the defendant has purposefully availed himself of the privilege of conducting activities in the forum state. *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). Second, a court must also inquire whether "the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Burger King,* 471 U.S. at 476, 105 S.Ct. 2174 (quoting *International Shoe,* 326 U.S. at 320, 66 S.Ct. 154); *see also Pennzoil Products,* 149 F.3d at 201. We are mindful of the Supreme Court's admonition that the minimum contacts test provides few answers that "will be written in 'black and white.' The greys are dominant and even among them the shades are innumerable." *Kulko v. Superior Ct. of Cal.,* 436 U.S. 84, 92, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978).

## A. Summary of Internet Cases

 The issue of personal jurisdiction based on Internet activity is a relatively new issue for the federal courts. The varied federal court decisions have announced some guiding principles that can be gleaned from the case law. Under the minimum contacts inquiry, the general focus is the nature and quality of activity that a defendant conducts over the Internet. *See Zippo Mfg. Co. v. Zippo Dot Com., Inc.,* 952 F.Supp. 1119, 1124 (W.D.Pa.1997).

Personal jurisdiction clearly exists, for example, when Internet activity involves business over the Internet, including online contracts with residents of a foreign jurisdiction or substantial interactivity of a commercial nature with the Web site. *See, e.g., Zippo Mfg. Co.,* 952 F.Supp. at 1125–26 (held that jurisdiction may be exercised because defendant contracted with approximately 3,000 individuals and seven Internet access providers in Pennsylvania); *Maritz, Inc. v. Cybergold, Inc.,* 947 F.Supp. 1328, 1333 (E.D.Mo.1996) (held that creating an online commercial mailing list by signing people up at their Web site

for commercial purposes was purposeful availment); *Gary Scott Int'l, Inc. v. Baroudi*, 981 F.Supp. 714, 716–17 (D.Mass. 1997) (held that personal jurisdiction could be exercised because defendant solicited and sold his product via his Web site to Massachusetts residents and had a major deal with a Massachusetts business); *Superguide Corp. v. Kegan*, 987 F.Supp. 481, 486–87 (W.D.N.C.1997) (held that personal jurisdiction may be exercised under the assumption that citizens of the forum state via the Internet have utilized the commercial services and acquired products from the defendant); *Thompson v. Handa–Lopez, Inc.*, 998 F.Supp. 738, 743–44 (W.D.Tx.1998) (held that personal jurisdiction could be exercised when defendant entered into on-line contracts for commercial purposes with residents of the forum state). In the seminal case of *CompuServe, Inc. v. Patterson*, the Sixth Circuit held that on-line contracts between the defendant and plaintiff were sufficient to exercise personal jurisdiction over the defendant. 89 F.3d 1257, 1264 (6th Cir. 1996). In particular, the court found the defendant had a "substantial connection" with the forum state as more than a purchaser of services: "Patterson chose to transmit his software from Texas to CompuServe's system in Ohio, that myriad others. gained access to Patterson's software via that system, and that Patterson advertised and sold his product through that system." *Id.* at 1264.

Beyond such clear cut cases, courts have differed in their determination of the level of interactivity and commercial nature of the information that occurs on the Web site required to trigger personal jurisdiction. In one line of cases, courts have declined to exercise jurisdiction on the basis that the Web site is passive where the site merely provides information to those who seek it.[3] *See, e.g., Cybersell, Inc. v.*

*Cybersell, Inc.*, 130 F.3d 414, 418–19 (9th Cir.1997) (held that an Internet advertisement alone is insufficient to subject an advertiser to jurisdiction); *Transcraft Corp. v. Doonan Trailer Corp.*, No. 97–C–4943, 1997 WL 733905, at *8–*10 (N.D.Ill. Nov.17, 1997) (held that Web site advertisement with an e-mail address for inquiries was insufficient to subject a defendant to personal jurisdiction); *CFOs 2 Go, Inc. v. CFO 2 Go, Inc.*, No. C–97–4676 SI, 1998 WL 320821, at *6 (N.D.Cal. June 5, 1998) (held that Web site with description of defendant's business and contact information did not amount to purposeful availment); *Smith v. Hobby Lobby Stores, Inc.*, 968 F.Supp. 1356, 1364–65 (W.D.Ark.1997) (held that an advertisement in a trade publication on the Internet without a contract to sell any goods or services with citizens of the forum state is insufficient to trigger jurisdiction); *ESAB Group, Inc. v. Centricut, L.L.C.*, No. Civ. A. 4:98–1654–22, 1999 WL 27514, at *10 (D.S.C. Jan.15, 1999) (held that Defendant's maintenance of its Web site to sell products does not meet minimum contacts requirements for jurisdiction).

Another line of cases has rejected the holding that advertisement Web sites are merely passive. For example, in *Inset Sys., Inc. v. Instruction Set, Inc.*, the court held that a minimum contacts test was satisfied by merely an Internet advertisement and a toll-free number for inquiries. 937 F.Supp. 161, 165 (D.Conn.1996); *see also Telco Communications v. An Apple A Day*, 977 F.Supp. 404, 407 (E.D.Va.1997) (held that advertising and solicitation over the Internet via a Web site triggers jurisdiction). The weight of the case law, however, seems to favor the analysis that requires something more than a Web site that acts as a worldwide advertisement to trigger personal jurisdiction.

---

3. The following courts also declined to exercise personal jurisdiction over a defendant that had merely advertised on the Web. *See, e.g., Bensusan Restaurant Corp. v. King*, 126 F.3d 25 (2d Cir.1997); *Hearst Corp. v. Goldberger*, No. 96 Civ. 3260, 1997 WL 97097 (S.D.N.Y. Feb.26, 1997). While such cases are instructive, they were decided under the New York long-arm statute, which is more limited than due process.

A last category of cases exist that is difficult to classify because non-Internet contacts factored into the court's decision as to whether the exercise of personal jurisdiction was proper. In *Blumenthal v. Drudge,* for example, the court held that the exercise of personal jurisdiction was proper because of an interactive Web site as well as travel to the District of Columbia to promote his Web site. 992 F.Supp. 44, 54–56 (D.D.C.1998). Moreover, Drudge had also made contacts and solicitations via e-mail, telephone and mail with District residents. *Id.* Under a similar jurisdictional analysis, courts have held that personal jurisdiction may be exercised over a Defendant when contacts with the forum are something "more" than via a Web site. *See, e.g., Cody v. Ward,* 954 F.Supp. 43, 47 (D.Conn.1997) (held that minimum contacts were sufficient because the defendant made fraudulent misrepresentations about a stock purchase via e-mail and in a series of telephone calls); *Digital Equip. Corp. v. AltaVista Tech., Inc.,* 960 F.Supp. 456, 462 (D.Mass.1997) (held that minimum contacts test was satisfied because of a contract agreement to apply Massachusetts law and the solicitation of Massachusetts business though its Web site); *EDIAS Software Int'l, L.L.C. v. BASIS Int'l, Ltd.,* 947 F.Supp. 413, 418–421 (D.Ariz.1996) (held that a contract and longstanding relationship with the plaintiff on top of defamatory statements about the plaintiff via e-mail and through its Web page was sufficient to trigger personal jurisdiction); *Resuscitation Techs., Inc. v. Continental Health Care Corp.,* No. IP 96–1457–C–M/S, 1997 WL 148567, at *5 (S.D.Ind. Mar.24, 1997) (held that the forum state could exercise personal jurisdiction based on defendant's extensive communication through e-mail and by fax relating to a joint business operation that would have a significant commercial impact in the forum state); *Heroes, Inc. v. Heroes Found.,* 958 F.Supp. 1, 4–5 (D.D.C.1996) (held that Web page and an advertisement in a local paper soliciting contributions was sufficient to trigger jurisdiction); *American Network, Inc. v. Access America/Connect Atlanta,* 975 F.Supp. 494, 498–99 (S.D.N.Y.1997) (held that Web page advertisement and services agreements delivering software packages to six New York subscribers trigger jurisdiction); *Hasbro, Inc. v. Clue Computing, Inc.,* 994 F.Supp. 34, 44–45 (D.Mass.1997) (held that its performance of work for a Massachusetts company coupled with an Internet site to attract customers was sufficient to exercise personal jurisdiction).

## B. Minimum Contacts

### 1. Internet Activity

We must examine whether the Defendant has minimum contacts "with the forum" and did reasonably anticipate "being haled into court there." *World–Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. 559. In doing so, we presume that Plaintiff's allegations are true. *TJS Brokerage,* 940 F.Supp. at 787. By examining the current case law on the Internet, we find that many courts have exercised personal jurisdiction when a defendant has posted a Web page and participated in other non-Internet related contact with the forum. *See, e.g., Cody,* 954 F.Supp. at 47; *Resuscitation Techs.,* 1997 WL 148567, at *5. In *Blumenthal,* for example, not only did the Defendant operate a Web site with defamatory material, but he also made trips to the District of Columbia to promote his Web site and made contacts with various District residents via e-mail, telephone and U.S. mail. 992 F.Supp. at 54. The *Blumenthal* court found that in order for the court to exercise jurisdiction, beyond the maintenance of a home page, "there must also be some other non-Internet related contacts between the defendant and the forum state." *Id.* at 56. Ms. Sherrell has not recently participated in any non-Internet related contacts with Pennsylvania residents,[4] *see* Decl. Sherrell 2/18/99 at ¶¶ 3–7;

---

4. Defendant's involvement in fluoridation

cases was not only over 15 years ago, but also

Decl. Barrett 3/5/99 at ¶¶ 9–29, and thus we must solely examine the strength of Defendant's ties with this forum via her Internet activity. *Zippo*, 952 F.Supp. at 1124.

First, Defendant maintained two of her own informational Web sites on which there exists defamatory information and articles concerning the Plaintiff. *See* Decl. Barrett 3/5/99 at ¶¶ 10, 22. Plaintiff also asserts that the Defendant engaged in activity beyond maintaining information on her Web sites. Plaintiff argues that Defendant posted messages on various national listserves or news discussion groups with links back to her Web sites for the purpose of destroying his reputation and reaching hundreds, if not thousands, of Pennsylvania residents. *Id.* at ¶¶ 10, 12–26. For example, Ms. Sherrell posted to misc.health.alternative stating in part: "[t]he American Council on Science and Health, and Stephen Barrett's Quackwatch group pretend to be consumer advocates." *Id.* at ¶ 18. In another example, she posted to misc.kids.health with the following statement: "If you think Quackwatch is a reliable source of information, I suggest you look at it more closely." *Id.* at ¶ 20.

▮ The "constitutional touchstone" of personal jurisdiction is "whether the defendant purposefully established 'minimum contacts' in the forum state." *Burger King Corp.*, 471 U.S. at 474, 105 S.Ct. 2174. At the one end of the spectrum, the Court has held that "placement of a product into the stream of commerce, without more," is not enough to satisfy the purposeful availment requirement for minimum contacts. *Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (plurality). At the other end of the spectrum, the Court has held that defendant's circulation of a national magazine with libelous information in the forum state constituted sufficient minimum contacts. *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 104 S.Ct.

1473, 79 L.Ed.2d 790 (1984). The Court explained that the "regular monthly sales of thousands of magazines cannot by any stretch of the imagination be characterized as random, isolated, or fortuitous." *Id.* at 774, 104 S.Ct. 1473.

▮ In the Internet context, courts are divided as to whether personal jurisdiction should be exercised where the defendant merely maintains a Web site without any contract to sell goods or any active solicitation. While some courts have held that such "passive" Web sites are insufficient to trigger jurisdiction, *see, e.g., Cybersell*, 130 F.3d at 418–19; *Smith*, 968 F.Supp. at 1364–65, others have held that a Web site advertisement in and of itself is sufficient to confer jurisdiction, *see, e.g., Inset Sys.*, 937 F.Supp. at 165; *Telco Communications*, 977 F.Supp. at 407. Not only does the weight of the authority favor the rationale that a "passive" Web site is insufficient to trigger jurisdiction, but we believe that such decisions comport with the traditional concept of personal jurisdiction where merely fortuitous contact is insufficient. *See, e.g., Keeton*, 465 U.S. at 774, 104 S.Ct. 1473; *Asahi*, 480 U.S. at 112, 107 S.Ct. 1026. Moreover, following the rationale of *Inset Sys.* would subject anyone who posted information on the Web to nationwide jurisdiction. Thus, we follow the *Cybersell* line of cases and choose not to exercise jurisdiction based on the Defendant's two "passive" Web sites. *See Transcraft Corp.*, 1997 WL 733905, at *9. The Defendant's Web sites may include defamatory information about the Plaintiff as the creator of the Quackwatch Web site, but the fact that such information is accessible worldwide does not mean that the Defendant had the intent of targeting Pennsylvania residents with such information. Decl. Barrett 3/5/99 at ¶¶ 10, 22. Indeed, Plaintiff has failed to provide any evidence that Defendant's Web sites intended to target Pennsylvania residents.

unrelated to this Plaintiff's case for the purpose of specific jurisdiction. *Dayhoff Inc. v.*

*H.J. Heinz Co.*, 86 F.3d 1287, 1302 (3d Cir. 1996).

We agree with the Plaintiff that posting of messages to listserves and USENET discussion groups technically differs from the maintenance of a "passive" Web page because messages are actively disseminated to those who participate in such groups. *See ACLU*, 929 F.Supp. at 834–35. However, for jurisdictional purposes, we find that these contacts are akin to a "passive" Web site and insufficient to trigger this court's jurisdiction. Here, the nature and quality of the contacts made by the Defendant were accessible around the world and never targeted nor solicited Pennsylvania residents.[5] Every listserve or discussion group that the Defendant posted a message to was concerned with health care issues and was national in scope. *Id.* at ¶¶ 9, 12, 13, 16, 18, 20, 23.[6] Not unlike the maintenance of a "passive" Web site, anyone who is interested could become a member of such listserves or USENET groups,[7] and we cannot see how from that fact alone, it can be inferred that the Defendant directed its efforts towards Pennsylvania residents. *See Cybersell*, 130 F.3d at 419.

The analogy of a listserve or USENET discussion group to a "passive" Web site comports with the limited case law on the relationship between Internet activity and personal jurisdiction. Unlike distributors of magazines or other materials who can affirmatively decide not to sell or distribute to certain forums, after posting to a listserve or USENET discussion group on the Internet, the option of bypassing certain regions is not available. *See Hasbro*,

994 F.Supp. at 42. We are mindful that "the likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet." *Zippo Mfg. Co.*, 952 F.Supp. at 1124. The Defendant did not participate in any on-line interactions such as the acceptance of information from forum residents, *see Maritz, Inc.*, 947 F.Supp. at 1333, the entrance into a contractual agreement via the transmission of electronic mail, *see, e.g., Zippo Mfg. Co.*, 952 F.Supp. at 1126–27; *CompuServe*, 89 F.3d at 1263, or the use of its Web sites to encourage contacts with forum residents, *see, e.g., Hasbro*, 994 F.Supp. at 44; *Gary Scott Int'l*, 981 F.Supp. at 717.[8] The non-commercial nature of Defendant's postings means that she is unlike the commercial entrepreneurs in other Internet cases who have actively availed themselves of the privilege of conducting business in the forum state.

Moreover, all of the presumed defamatory statements made by the Defendant attacked the Plaintiff in his national capacity as an advocate against health care fraud and in favor of the fluoridation of water sources. Decl. Barrett 3/5/99 at ¶¶ 13, 16, 18, 20, 22. Even Plaintiff highlights in his affidavit that he is well-known in his capacity as an international figure through the notoriety of his Web site which has "received international acclaim, with more than fifty awards and/or favorable mentions in newspapers, magazines, and journals throughout the world." *Id.* at ¶ 6.

---

**5.** While Plaintiff asserts that Defendant is "'closely associated with Philip Heggin," who solicits Internet users to become hosts for locally-based STOP Flouridation USA home pages, *see* Decl. Barrett 3/5/99 at ¶ 27, such a "close association" does not amount to any kind of evidence that Defendant has participated in local solicitation of Pennsylvania residents.

**6.** We certainly do not hold Ms. Sherrell accountable for other Internet users who have made links to her Web page or disseminated messages originally written by her. *See* Decl. Barrett 3/5/99 at ¶¶ 14–15, 24, 28; Decl. Sher-

rell 4/2/99 at ¶¶ 7–8. Regardless, none of this Internet activity by others users targeted Pennsylvania residents. *Id.*

**7.** The involvement of Internet users in such groups across the world are at the option of the individual user, with the exception that some newsgroups are moderated. *See ACLU*, 929 F.Supp. at 834–35.

**8.** The exception is an e-mail exchange between the Plaintiff and Defendant that will be discussed below.

Plaintiff cannot point to any defamatory statements that attack him in his capacity as a Pennsylvania psychiatrist or any postings by the Defendant that intended to target Internet users in Pennsylvania.

■ Finally, we find that the addition of two e-mail contacts by the Defendant to the Plaintiff is insufficient to trigger personal jurisdiction. The Third Circuit has held that telephone communications or mail sent by a defendant does not trigger personal jurisdiction if they "do not show purposeful availment." *Mellon Bank*, 983 F.2d at 556; *see also Reliance Steel Prods.*, 675 F.2d at 589; *Gehling*, 773 F.2d at 544. The first e-mail was sent by the Defendant in order to engage Plaintiff in an e-mail discussion about issues discussed on his Quackwatch Web site. Decl. Barrett 3/5/99 at ¶ 9. Plaintiff refused to respond to her e-mail. *Id.* However, when Plaintiff later came across her Web site, he did then e-mail Defendant the following message threatening a lawsuit:

> I have just read and dowloaded your page at http://home.cdsnet.net/ fluoride/quacks.htm. The information you have taken from Privitera's book contains statements about me that are false and defamatory. I have informed him of this fact and, since he has refused to retract them, I expect to sue him in a California court for libel. Unless you remove what his book says about me from your web page, I will add you as a co-defendant. . . .
>
> You also directly accuse me of being a big liar. I would suggest that you remove that statement also. If you want to attack what I say, you have a right to do so. But calling me names can get you sued.
>
> I regard libel as a serious matter. I am not thin-skinned and have no objection to people disagreeing with my ideas. But attacking me as dishonest is quite another matter.

*Id.* at ¶ 10. In response, the Defendant sent an e-mail stating that she had modified the content of her Web site to some degree. *Id.* at ¶ 11.

■ The extent of the e-mail communication between Plaintiff and Defendant does not amount to "purposeful availment" of the "privilege of acting" within Pennsylvania. As minimal correspondence alone will not satisfy minimum contacts, we cannot say that the Defendant's act of initially sending e-mail or the second responsive e-mail to the Plaintiff triggers jurisdiction. *Compare Carteret Savings Bank*, 954 F.2d at 149. While telephone and mail contacts with residents of the forum state can be enough to subject a defendant to jurisdiction, such cases include other indications of a substantial connection. In *Carteret Savings*, for example, in addition to telephoning and corresponding with his client, the Louisiana lawyer also traveled to New Jersey to visit his client. *Id.* at 149–50; *see also Mesalic v. Fiberfloat Corp.*, 897 F.2d 696, 701 (3d Cir.1990) (mail and telephone communications between New Jersey and Florida, as well as delivery of the product and substantial repairs by defendant's mechanics in New Jersey triggered jurisdiction). Here, we find that the sent e-mails do not occur in a context of a "substantial connection," nor amount to the level of purposeful targeting required under the minimum contact analysis. *See Burger King*, 471 U.S. at 475, 105 S.Ct. 2174.

Thus, we find that Plaintiff has failed to show that Defendant purposefully availed herself of the privilege of conducting activities within the forum state through her Internet activity.

### 2. Effects Test

■ Next, Plaintiff argues that this court can exercise jurisdiction over the Defendant under the "effects test" of *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). The test focuses on the extent to which Defendant's tortious conduct is aimed at or has effect in the forum state. In *Calder*, for example, the Court found proper a California court's exercise of personal jurisdiction

over the defendants, because the defendants knew that California would be the "focal" point of the injuries resulting from their intentional conduct. *Id.* at 789–90, 104 S.Ct. 1482. The Court chose to exercise jurisdiction because it concluded that the defendants' intentional, and allegedly tortious, actions were expressly aimed at California.[9] The Third Circuit has elucidated the *Calder* "effects test" as follows:

(1) The defendant committed an intentional tort;

(2) The plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort;

(3) The defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity.

*IMO Indus., Inc. v. Kiekert AG,* 155 F.3d 254, 265–66 (3d Cir.1998).

Courts have also applied the effects test to tortious on-line conduct. *See, e.g., Panavision Int'l, L.P. v. Toeppen,* 141 F.3d 1316, 1322 (9th Cir.1998); *EDIAS Software Int'l,* 947 F.Supp. at 420; *Transcraft Corp.,* 1997 WL 733905, at *3. The Ninth Circuit found that jurisdiction could be exercised over the nonresident defendant, who for the purpose of extortion, created a scheme for registering Panavision's trademark as a Web site. *Panavision Int'l,* 141 F.3d at 1322. In applying the effects test, the court stated that "simply registering someone else's trademark as a domain name and posting a web site on the Internet is not sufficient" to trigger jurisdiction. *Id.* However, the court chose to exercise jurisdiction over the defendant in *Panavision* because he knew that his scheme of extortion would likely have "the effect of

injuring Panavision in California where Panavision has its principal place of business and where the movie and television industry is centered." *Id.*

As discussed above, all of the defamatory statements made by the Defendant attacked Plaintiff in his national capacity as a physician who had spoken out against health care fraud and supported the fluoridation of water sources. Decl. Barrett 3/5/99 at ¶¶ 13, 16, 18, 20, 22. Plaintiff is clearly a national, if not international, figure who has investigated and dealt with issues relating to quackery, health frauds, misinformation and consumer strategy. *Id.* at ¶¶ 4, 6. The following are several examples of Defendant's defamatory statements posted on the Internet:

(1) To those of you who are interested in Stephen Barrett's true purpose in attacking chiropractic, as well as his relentless promotion of water fluoridation, this file might be of interest: http://home.cdsnet.net/ fluoride/quacks.htm. It exposes Quackwatch and the American Council on Science and health (Barrett, Jarvis, Whelan, Easley, Munro, et al) in their attempt to eliminate competition in the health care field, discredit chiropractors, and pander to the anti-consumer special interests.

(2) The American Council on Science and Health, and Stephen Barrett's Quackwatch group pretend to be consumer advocates.

(3) Barrett Easley, Whelan, Jarvis: Bogus Consumer Watchdogs.

*Id.* at ¶¶ 13, 18, 22. All these defamatory statements associate Plaintiff with his work associated with the Quackwatch Web site and none as a psychiatrist practicing

**9.** The following factors were significant to the Court's determination:

The allegedly libelous story concerned the California activities of a California resident. It impugned the professionalism of an entertainer whose television career was centered in California. The article was drawn from California sources, and the brunt of the harm, in terms both of respondent's emotional distress and the injury to her professional reputation, was suffered in California. In sum, California is the focal point both of the story and of the harm suffered.

*Calder,* 465 U.S. at 788–89, 104 S.Ct. 1482.

in Pennsylvania. Under the "effects test" of *Calder,* we do not find that such defamatory statements amount to actions "expressly aimed" at Pennsylvania. 465 U.S. at 788, 104 S.Ct. 1482. If anything, the defamatory statements concern the Plaintiff's non-Pennsylvania activities and impugn his professionalism as a nationally-recognized consumer health advocate.

■ Yet Plaintiff, without any evidentiary support, maintains that the brunt of the harm from such defamatory statements was suffered in Pennsylvania, which is the focal point of his professional and personal life. It is certainly foreseeable that some of the harm would be felt in Pennsylvania because Plaintiff lives and works there, but such foreseeability is not sufficient for an assertion of jurisdiction. *World–Wide Volkswagen Corp.,* 444 U.S. at 295, 100 S.Ct. 559; *Rush v. Savchuk,* 444 U.S. 320, 328–329, 100 S.Ct. 571, 62 L.Ed.2d 516 (1980). While we agree that Pennsylvania residents are among the recipients or viewers of such defamatory statements, they are but a fraction of other worldwide Internet users who have received or viewed such statements.[10] "[T]he mere allegations that the Plaintiff feels the effect of the Defendant's tortious conduct in the forum because the Plaintiff is located there is insufficient to satisfy *Calder.*" *See IMO,* 155 F.3d at 263. Unless Pennsylvania is deliberately or knowingly targeted by the tortfeasor, the fact that harm is felt in Pennsylvania from conduct occurring outside Pennsylvania is never sufficient to satisfy due process. *See Santana Prods., Inc. v. Bobrick Washroom Equip.,* 14 F.Supp.2d 710, 715 (M.D.Pa.1998); *Surgical Laser Techs., Inc. v. C.R. Bard, Inc.,* 921 F.Supp. 281, 285 (E.D.Pa.1996); *Driscoll v. Matt Blatt Auto Sales,* Civ. A. 95–5314, 1996 WL 156366, at *3 (E.D.Pa. Apr.3, 1996). Thus, we refuse to exercise jurisdiction over the Defendant on the basis that some of the harm caused by her tortious conduct occurred in Pennsylvania.

**C. Fair Play and Substantial Justice**

■ Since the Plaintiff has failed to prove the first prima facie element—that the Defendant had minimum contacts with Pennsylvania necessary to have reasonably anticipated being haled into court—we are not required to examine whether the exercise of personal jurisdiction is reasonable. *See Pennzoil Prods. Co.,* 149 F.3d at 201. When the minimum contacts requirement is met, personal jurisdiction cannot be exercised unless it would comport with " 'traditional notions of fair play and substantial justice.' " *Asahi Metal Indus.,* 480 U.S. at 113, 107 S.Ct. 1026 (citations omitted).

We certainly are sympathetic to the plight of the Plaintiff and that he should be able to seek proper relief. Although either party would be burdened to litigate in the other's home state, we do note that Plaintiff has sued Joseph Lisa for libel and is suing, or expecting to sue, two individuals in California for libel. Decl. Barrett 3/5/99 at ¶¶ 10, 22. Moreover, we cannot help but think that the exercise of personal jurisdiction over non-commercial on-line speech that does not purposefully target any forum would result in hindering the wide range of discussion permissible on listserves, USENET discussion groups and Web sites that are informational in nature. However, we need not reach the issue of whether the exercise of jurisdiction would be unreasonable or unfair in this case. Plaintiff has failed to prove that Defendant has the minimum contacts sufficient to meet the first prong of the specific jurisdiction analysis.

In conclusion, we cannot exercise personal jurisdiction over the Defendant Darlene Sherrell. An appropriate order follows.

---

**10.** We note that Plaintiff has not provided any evidence that Pennsylvania residents accessed any of the Web sites or participated in any of the relevant listserves or USENET discussion groups. We merely presume that some Pennsylvania residents read the defamatory materials as part of the network of worldwide users who have access to the Web.

732

## ORDER

AND NOW, this 12th day of April, 1999, upon consideration of Defendant Darlene Sherrell's Motion to Dismiss Pursuant to Fed.R.Civ.Proc. 12(b)(2) for Lack of Personal Jurisdiction filed on February 22, 1999, the Answer of Plaintiff to Defendant Darlene Sherrell's Motion to Dismiss filed on March 8, 1999, and Defendant Darlene Sherrell's Reply Brief, it is hereby ORDERED that said Motion is GRANTED and Plaintiff's Complaint against Defendant Darlene Sherrell is DISMISSED without prejudice pursuant to Fed.R.Civ.P. 12(b)(2).