730 A.2d 854 (1999)
Tammy S. BLAKEY, Plaintiff-Appellant,
v.
CONTINENTAL AIRLINES, INC., a foreign corporation, Kaye V. Riggs, Joe Vacca, Mark J. Farrow, Don Jensen, Dave Orozco, Thomas N. Stivala, Defendants-Respondents, and
Steve Abdu, Defendant.
Superior Court of New Jersey, Appellate Division.
Argued April 19, 1999.
Decided June 9, 1999.
*856 Nancy S. Martin, for plaintiff-appellant (Kenney, Schaer & Martin, attorneys; Linda B. Kenney, of counsel, Red Bank; Ms. Martin, of counsel and on the brief).
Robert H. Bernstein, Newark, for defendant-respondent Continental Airlines, Inc. (Epstein, Becker & Green, attorneys; Mr. Bernstein, of counsel; Mark D. Lurie and Michael D. Markey, on the brief).
Ellen M. Boyle, New York City, for defendants-respondents Kaye V. Riggs, Joe Vacca, Mark J. Farrow, Dave Orozco and Thomas N. Stivala (Satterlee, Stephens, Burke & Burke, attorneys; Ms. Boyle, of counsel and on the brief).
Steven H. Issacson, West Orange, for defendant-respondent Don Jensen (David S. Springer, attorney, Florham Park; and relying on the brief submitted on behalf of defendants-respondents Riggs, Vacca, Farrow, Orozco and Stivala).
Before Judges PETRELLA, CUFF and COLLESTER.
*855 The opinion of the court was delivered by CUFF, J.A.D.
In this appeal, we review the propriety of the dismissal of plaintiff's defamation, sexual harassment, business libel, and emotional distress claims against plaintiff's employer and certain co-employees. All of the claims arise from a series of allegedly defamatory remarks published on a computer bulletin board accessible only by employees through personal computers. The claims against the individual employees were dismissed on the basis of lack of personal jurisdiction. The claims against the employer were dismissed on the ground that the record established no basis to impose vicarious liability on the employer for remarks uttered by employees regarding a co-employee. We affirm.
Plaintiff Tammy S. Blakey is a pilot for defendant Continental Airlines, Inc. (Continental) and has been employed by Continental since 1984. In January 1990, plaintiff became the first woman captain of Continental's Airbus A300 aircraft. She resides in Seattle, Washington, and was based at Continental's Newark hub from 1990 to 1993. Since 1993, she has been based at Continental's Houston hub.
On February 5, 1993, plaintiff filed a complaint against Continental in the United States District Court for the Western District of Washington, seeking injunctive relief enjoining Continental from maintaining *857 a hostile work environment and directing it to investigate the persons responsible for subjecting plaintiff to sexually explicit photographs, cartoons, and abusive comments. Also in 1993, plaintiff filed a complaint in the same court against Continental alleging harassment and discrimination under 42 U.S.C.A. § 2000e and the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -42. By order dated May 13, 1993, the actions were transferred to the United States District Court for the District of New Jersey. Following a five week trial, a jury found Continental liable for sexual harassment and awarded plaintiff $875,000. Blakey v. Continental Airlines, Inc., 992 F.Supp. 731 (D.N.J.1998).
On September 25, 1995, well before trial, plaintiff moved to amend her federal complaint to include a cause of action for defamation against seven of her co-workers based on statements made by them about her after she filed her federal complaint. She also sought to hold Continental vicariously liable for the allegedly defamatory remarks of her co-employees. In denying this relief, a federal magistrate observed that plaintiff had other forums available to pursue these subsequent claims.
Soon thereafter, plaintiff filed a complaint in the Superior Court which alleged that defendants Kaye V. Riggs, Joe Vacca, Steve Abdu, Mark J. Farrow, Don Jensen, Dave Orozco, and Thomas N. Stivala published allegedly defamatory statements on Continental's Crew Management System (CMS), that Continental was liable for a hostile work environment arising from the allegedly defamatory statements, that Continental had participated in business libel on the basis of its operation of the CMS, and that Continental and the individual defendants intentionally inflicted emotional distress on plaintiff. All individual defendants but Jensen and Abdu filed a motion to dismiss the complaint for lack of personal jurisdiction. By order dated April 3, 1997, Judge Julio Fuentes granted this motion. On July 28, 1997, a consent order was filed dismissing the complaint against defendant Jensen, another non-resident pilot.[1]
At the same time, Continental sought dismissal of the complaint on the basis that it was not vicariously liable for its employees' statements. This motion was also granted by order dated April 3, 1997.
On December 12, 1997, Continental filed a motion for summary judgment to dismiss the hostile work environment claim. By order dated April 22, 1998, Judge Vazquez granted this motion.[2]
On appeal, plaintiff argues that Judge Fuentes erred in dismissing the individual defendants for lack of personal jurisdiction. She asserts that each individual non-resident defendant has sufficient minimum contacts with New Jersey to subject each of them to personal jurisdiction in this state. She further contends that this court has personal jurisdiction of each defendant because the alleged defamatory statements were published in this state.
Plaintiff also insists that each individual defendant's comments were made by him in the scope of his employment. Therefore, the employer may be held vicariously liable for the remarks. Further, plaintiff asserts that the statements made by the individual defendants on the crew member Forum created a hostile work environment and Continental is responsible as the employer for the hostile work environment created by its employees. In order to place these arguments in context, some explanation of the CMS and the associated Forum is required.
Continental's computerized CMS provides information on flights, information on *858 crew member schedules, information on pay, and information on pairings. According to Anna White, Continental's Director of Crew Systems and Planning, the CMS was used by "[c]rew members, our pilots and flight attendants, and then also Continental Airlines scheduling staff, [and] pay staff." The information provided on the CMS was "necessary for crew members to perform their jobs at Continental" and included "a copy of their schedules and their ongoing activities." According to White, Continental required crew members to access that information.
Continental provided several different ways for flight crew members to access the CMS. First, in "crew base locations" in Houston, Cleveland, Newark, Los Angeles, Honolulu and Guam, it provided "dum[b] terminals" with direct lines accessing the mainframe computer. In addition, some terminals in various airport locations interfaced another system that also could be used to access the CMS. Second, a voice response system with "800" and local numbers provided access to some functions. Third, the system could be accessed remotely by personal computers through CompuServe. This third method of access was optional for crew members.
Continental negotiated a contract with CompuServe in which CompuServe was a service provider for Continental for a variety of functions including a connection to Continental's mainframe systems to provide crew members access to the CMS and to reservations. Accessing the CMS through CompuServe required a personal computer (PC), modem and phone line. Crew members would contact Compu-Serve, identify themselves as a Continental Airlines crew member, and they would be sent a membership kit. White explained, "[t]he membership kit contains software that's been specialized for Continental. And they would load that software on their PC." Continental did not require its pilots or flight attendants to become members of CompuServe and did not provide its crew members with PCs for that purpose.
To reach the actual CMS location, a user logs onto CompuServe and inputs the command "go Continental." The command then would bring up a Continental menu of six different activities, one of which was "crew member access." By clicking on "crew member access," the user would receive a list of six or seven items, one of which was "Access Continental Crew Management System." Upon selecting that option, the crew member was connected to CompuServe, which would then pass that user over through lines to the Continental system, the Continental mainframes, and then the user would access the CMS the same way as from a dumb terminal at a crew location. The user would input his/her password and Continental "ID" and continue to navigate through the system.
The Forum was an area available in CompuServe for crew members to exchange information and opinions and served as a computer bulletin board. Crew members who utilized the CMS were not required to access the Forum. While access to the Forum did not require input of a password identifying the user as a crew member, the user was required to provide a Continental crew member identification to receive the software necessary to access the system, and the software itself was encrypted so that its use was restricted to pilots and flight attendants.
Members of Continental's management were not permitted to post messages or to respond to messages on the Forum. However, chief pilots and assistant chief pilots, who were considered to be management within Continental, had access to the Forum. No department at Continental was responsible for monitoring the Forum or reviewing the messages it contained.
Problems accessing the Forum were to be directed to CompuServe; Continental employees would be unable to provide assistance. But, once the user had accessed the Forum, technical support and general troubleshooting assistance for Forum users was provided by Continental pilots *859 and flight attendants who volunteered for the position of systems operators, known as SYSOPS. SYSOPS were not paid by either CompuServe or Continental.
Continental paid no money to Compu-Serve in relation to the Forum. Compu-Serve, however, paid Continental 3 percent of the $5.80 per hour fee it charged to provide direct connection between Compu-Serve and the Continental mainframe.
CompuServe charged its members $9.95 for basic service that included five hours of access time, with a charge of $2.95 per hour for any additional hours. In addition, White testified that "if there are any direct connect charges between Compu-Serve and Continental Airlines' mainframes there's a $5.80 an hour connection fee for that." Those fees were imposed by CompuServe and Continental sent no bills to its crew members for use of the CMS.
The information contained within the CMS was located in Continental's mainframe computer, physically located at Electronic Data Systems (EDS) in Charlotte, North Carolina, and was not maintained in a CompuServe mainframe. Continental had out-sourced most of its technology department to EDS to avoid having internal programmers, project management and in-house computers. EDS has been characterized as a service provider for Continental. Continental maintained contracts with EDS and CompuServe, and Continental retained the ability to negotiate for any contractual terms it deemed fit and appropriate.
Continental gave CompuServe permission to come to its pilots' lounges, and provide leaflets and membership kits to encourage its pilots and flight attendants to join CompuServe. Continental also gave CompuServe permission to use the Continental name. Continental could withdraw its permission only when the contract between it and CompuServe was completed.
Upon joining the Forum, a disclaimer warned of the need to use appropriate language, avoid profanity, and abide by the rules of CompuServe. SYSOPS were responsible for enforcing compliance with these conditions.
Beginning in 1995, and while plaintiff's federal lawsuit was pending in New Jersey, a series of communications, referred to as "threads," were published on the Forum. Specifically, on July 14, 1995, First Officer Kaye V. Riggs[3] wrote that plaintiff "doesn't really belong [with Continental] anyway, at least to my mind.... I believe [plaintiff's] lawsuit is bogus, the charges patently false, and that she is out to get a quick buck. Why don't you ask her about the training she was given, far in excess of the syl[l]abus, just to be able to pass her PC's[4]?" On July 16, 1995, Riggs wrote to plaintiff via the Forum that he had heard she "crashed [her] floatplane" and asked "is this a damned lie, too?" On July 17, 1995, a thread was published asking plaintiff: "What about the engine(s) on the A-300 you burned up by overtemping?" The thread identifies the author as Riggs. On July 23, 1995, referring to plaintiff, Riggs wrote: "EVERY MEMBER OF THIS FORUM SHOULD BE AWARE THAT CERTAIN INDIVIDUALS WILL ATTEMPT TO CAUSE HARM TO OTHERS THEY DISLIKE."
Meanwhile, on July 21, pilot Joe Vacca posted a thread to Blakey stating that she "need[ed] to prey on a legal system that does not stand up to people who are vexatious and try to get even for their lack of interpersonal skills." On July 25, 1995, Vacca sent a thread to Nancy Novaes, presumably another pilot, referring to her and plaintiff as "feminazis." He also posted a thread stating: "I am curious if Ms. Blakey will reimburse CAL for the: 1) Engine she overtemped and destroyed. 2) The $250,000 in hail damage done when she flew through the TRW, with the F/O *860 trying to tell her not to go through the WX, etc. etc."[5] He also made similar statements in a thread dated July 15.
Pilot Steve Abdu in a February 1995 thread referred to "self induced engine problems on the A-300" and stated that he had "flown with enough first officers who had the displeasure of flying with the captain in question."
Pilot Mark Farrow, apparently referring to plaintiff and another woman who filed a sexual harassment lawsuit, stated in a February 1995 thread that "[t]hey are weak pilots by reputation, and have alienated themselves from their peers with their boorish behavior." Referring again to the two women, he stated in another thread that "these two individuals are looking to justify their past records by blaming this pilot group, and holding this company liable for not tipping the scales in their favor."
Pilot Donald Jensen stated in a February 1995 thread that "[t]hey are taking advantage of the fact that they are women to pursue these lawsuits" and "[m]aybe if the performance of these 2 women were better, they would have the respect of their peers...."
In February 1995, pilot Thomas Stivala stated that "Tammy has problems not because she is a woman but because she doesn't possess the skills to interact with crew members effectively."
According to plaintiff's complaint (the thread is not included in the record), at some point pilot Dave Orozco "falsely wrote and caused to be published on the System that greed must be the motive [of Blakey's lawsuit] and that Blakey is `selfish.' " 
I
We will address the personal jurisdiction issue first. In that regard we note certain undisputed facts regarding the individual defendant's residency and work stations.
At the time the threads were posted on the Forum, the only pilot who resided in New Jersey was defendant Steve Abdu. Defendant Mark Farrow lived in both Colorado and Texas; his employment base was Texas. As a union representative, he visited Newark once after the complaint was filed. Defendants Dave Orozco and Tom Stivala resided in Texas; their employment base was also Texas. Defendant Kaye Riggs resided in California and Texas; he was based in California and Texas. Joe Vacca resided in Colorado; his employment was based in Colorado and Texas. Furthermore, at the time the threads were posted, plaintiff neither resided nor was based in Newark. Plaintiff had been based in Newark from 1990 to 1993; she has never resided in New Jersey.
In his opinion, Judge Fuentes concluded that the court lacked general jurisdiction of the individual defendants. After canvassing the developing law concerning claims arising from allegedly defamatory electronic mail messages, he concluded that specific personal jurisdiction may be asserted over a non-resident defendant solely on the basis of their electronic contacts "only when they specifically direct their activities at the forum, the plaintiff is a resident of the forum, and the brunt of the injury is felt in the forum state." He noted that this comports with existing authority on the issue of personal jurisdiction.
Then, applying these principles to the jurisdictional facts, Judge Fuentes found that this state lacked personal jurisdiction of the individual defendants. He concluded that the individual defendants
did not engage in any activities by which they purposefully availed themselves of the privilege of conducting any business in New Jersey, and thereby did not invoke the benefits and protection of its laws. There is also no evidence that the defendants purposefully directed their *861 allegedly defamatory statements at [New Jersey].
We agree.
New Jersey permits the exercise of personal jurisdiction over non-resident defendants to the extent "consistent with due process of law." R. 4:4-4(b)(1); Jacobs v. Walt Disney World, Co., 309 N.J.Super. 443, 452, 707 A.2d 477 (App. Div.1998). "[D]ue process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend `traditional notions of fair play and substantial justice.'" Lebel v. Everglades Marina, Inc., 115 N.J. 317, 322, 558 A.2d 1252 (1989) (quoting International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95, 102 (1945)). Thus, the test for personal jurisdiction has two facets: "minimum contacts" and "fair play and substantial justice." Ibid.
This measure of jurisdiction, particularly as adopted by New Jersey, recognizes two forms of personal jurisdiction: general and specific. Id. at 322-23, 558 A.2d 1252; see also Waste Management, Inc. v. Admiral Ins. Co., 138 N.J. 106, 119, 649 A.2d 379 (1994), cert. denied sub nom. WMX Tech., Inc. v. Canadian Gen. Ins. Co., 513 U.S. 1183, 115 S.Ct. 1175, 130 L.Ed.2d 1128 (1995); Jacobs, supra, 309 N.J.Super. at 452, 707 A.2d 477. General jurisdiction arises from a defendant's "continuous and systematic activities in the forum" and is not related to the subject matter of the lawsuit, or restricted by the level of a defendant's contacts with the forum state in connection with the suit. Waste Management, supra, 138 N.J. at 119, 649 A.2d 379; Lebel, supra, 115 N.J. at 323, 558 A.2d 1252; Jacobs, supra, 309 N.J.Super. at 452, 707 A.2d 477. A plaintiff attempting to establish general jurisdiction over a defendant "must show substantially more than mere minimum contacts" to ensure the fairness of subjecting a particular non-resident defendant to the potential for being sued in the same manner as a resident of the forum state. Jacobs, supra, 309 N.J.Super. at 453, 707 A.2d 477.
Specific jurisdiction may be established where the cause of action arises directly from a defendant's contacts with the forum state. Waste Management, supra, 138 N.J. at 119, 649 A.2d 379; Jacobs, supra, 309 N.J.Super. at 452, 707 A.2d 477. In that case, the minimum contacts inquiry focuses on "`the relationship among the defendant, the forum, and the litigation.'" Lebel, supra, 115 N.J. at 323, 558 A.2d 1252 (quoting Shaffer v. Heitner, 433 U.S. 186, 204, 97 S.Ct. 2569, 2579, 53 L.Ed.2d 683, 698 (1977)). The requirement "is satisfied so long as the contacts resulted from the defendant's purposeful conduct and not the unilateral activities of the plaintiff." Ibid. (citing World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297-98, 100 S.Ct. 559, 567-68, 62 L.Ed.2d 490, 501-02 (1980)). Plaintiff asserts defendants' activities establish specific jurisdiction over them.
The minimum contacts evaluation is conducted on a case-by-case basis. Waste Management, supra, 138 N.J. at 122, 649 A.2d 379. A critical portion of the inquiry focuses on the purposefulness of a defendant's contacts with the forum state, ensuring that a defendant "will not be haled into a jurisdiction solely as a result of `random,' `fortuitous,' or `attenuated' contacts." Lebel, supra, 115 N.J. at 323, 558 A.2d 1252 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528, 542 (1985)); Waste Management, supra, 138 N.J. at 120-22, 649 A.2d 379. But, "[a]n intentional act calculated to create an actionable event in a forum state will give that state jurisdiction over the actor." Waste Management, supra, 138 N.J. at 126, 649 A.2d 379 (citing Calder v. Jones, 465 U.S. 783, 791, 104 S.Ct. 1482, 1488, 79 L.Ed.2d 804, 813 (1984)).
*862 If minimum contacts have been established, the court must then evaluate the fairness of requiring a defendant to defend the lawsuit in the plaintiff's chosen jurisdiction. Accura Zeisel Mach. Corp. v. Timco, Inc., 305 N.J.Super. 559, 566, 702 A.2d 1340 (App.Div.1997). The relevant factors in that analysis are:
(1) the burden on the defendant; (2) the interests of the forum state; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies.
[Ibid. (citing Asahi Metal Indus. Co. v. Superior Court of Cal., 480 U.S. 102, 113, 107 S.Ct. 1026, 1034, 94 L.Ed.2d 92, 105 (1987); Waste Management, supra, 138 N.J. at 122, 649 A.2d 379).]
Plaintiff finds support for her position in cases where the courts have found personal jurisdiction in a particular forum based on the publication in the forum state of newspapers and magazines containing the allegedly defamatory remarks. Defamatory communications transmitted on the Internet and published in print media share the common characteristic of the dissemination of false and damaging information. Therefore, we initially focus our attention on the print media defamation cases.
In Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 773, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790, 796-97 (1984), the United States Supreme Court found the existence of personal jurisdiction solely on the basis that the magazine containing the allegedly libelous statements regularly circulated within the forum state. The plaintiff was not a resident of the forum state, and her only connection with the forum was the circulation there of a magazine she assisted in producing. Id. at 772, 104 S.Ct. at 1477, 79 L.Ed.2d at 796.
The Court first found that the regular circulation in the forum of thousands of copies of the defendant's magazines could not "by any stretch of the imagination be characterized as random, isolated or fortuitous." Id. at 774, 104 S.Ct. at 1478, 79 L.Ed.2d at 797. The Court then examined the relationship between the defendant, the forum and the litigation, focusing on the forum's interest in asserting jurisdiction in light of the fact that the plaintiff was seeking to recover in that suit damages for injuries suffered in all states. Id. at 775-81, 104 S.Ct. at 1478-81, 79 L.Ed.2d at 798-802.
One element of the "fairness" analysis involved determining whether the defendant's activities relating to the forum provided that state with a legitimate interest in holding it answerable on a claim related to those activities. Id. at 775-76, 104 S.Ct. at 1479, 79 L.Ed.2d at 798-99. The Court considered that the plaintiff was suing in part for damages suffered in the forum state, which indisputably had an interest in redressing such injuries that actually occurred within that state. Id. at 776, 104 S.Ct. at 1479, 79 L.Ed.2d at 798-99. "This interest extends to libel actions brought by nonresidents. False statements of fact harm both the subject of the falsehood and the readers of the statement." Id. at 776, 104 S.Ct. at 1479, 79 L.Ed.2d at 799. Consequently, the forum state "may rightly employ its libel laws to discourage the deception of its citizens." Ibid. Furthermore, a forum state may have a substantial interest in cooperating with other states and reducing the potential drain on judicial resources by providing a means to efficiently litigate in a single proceeding all issues and damage claims arising out of a libel suit with national implications. Id. at 777, 104 S.Ct. at 1480, 79 L.Ed.2d at 799.
Thus, the mere fact that a plaintiff is a non-resident of the forum state is insufficient to defeat a finding of personal jurisdiction established by the defendant's contacts. Id. at 779-80, 104 S.Ct. at 1480-81, 79 L.Ed.2d at 800-01. Nor is jurisdiction defeated merely because the bulk of the harm occurred outside the forum. *863 Id. at 780, 104 S.Ct. at 1481, 79 L.Ed.2d at 801. That circumstance "will be true in almost every libel action brought somewhere other than the plaintiff's domicile." Ibid.
In Calder, supra, 465 U.S. at 784-85, 104 S.Ct. at 1484, 79 L.Ed.2d at 809-10, decided the same day as Keeton, the Supreme Court held that personal jurisdiction existed in California over two Florida residents on the basis of an article published in a national magazine, which the defendants had written, researched, and edited in Florida. The plaintiff was an entertainer who lived and worked in California. Ibid. The Court found that jurisdiction was proper in California based on the "effects" of the defendants' Florida conduct in California:
The allegedly libelous story concerned the California activities of a California resident. It impugned the professionalism of an entertainer whose television career was centered in California. The article was drawn from California sources, and the brunt of the harm, in terms both of respondent's emotional distress and the injury to her professional reputation, was suffered in California. In sum, California is the focal point both of the story and of the harm suffered.
[Id. at 788-89, 104 S.Ct. at 1486-87, 79 L.Ed.2d at 812.]
In Calder the Court's analysis emphasized that the individual non-resident defendants purposely directed their activities against a California resident and that the damaging effects of their writing were felt by a person whose private and professional life was centered in California.
The Third Circuit explained that the Supreme Court's conclusions in Calder relied on the following findings:
First, the defendant committed an intentional tort. Second, the forum was the focal point of the harm suffered by the plaintiff as a result of that tort. Third, the forum was the focal point of the tortious activity in the sense that the tort was "expressly aimed" at the forum. Essential was a corollary finding that the defendants knew that the "brunt" of the injury caused by their tortious acts would be felt by the plaintiff in the forum.
[IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254, 261 (3d Cir.1998).]
Subsequent courts have characterized the Calder analysis as the "`effects' test." See, e.g., IMO Indus., supra, 155 F.3d at 261; Cybersell, Inc. v. Cybersell, Inc., 130 F.3d 414, 420 (9th Cir.1997). But, as the Fifth Circuit observed in Allred v. Moore & Peterson, 117 F.3d 278, 286 (5th Cir. 1997), cert. denied, ___ U.S. ___, 118 S.Ct. 691, 139 L.Ed.2d 637 (1998), "the effects test is not a substitute for a nonresident's minimum contacts that demonstrate purposeful availment of the benefits of the forum state."
Both the Keeton and Calder cases concerned allegedly defamatory statements published in print magazines and, to some extent, the outcome in each at least implicitly relied on the deliberate physical distribution within the forum state of the magazine itself. The case before this court, however, involves electronically transmitted communications. While Internet communications share some of the same features as print and television communications, some features such as the virtually limitless accessibility of many Internet connections renders this communication medium unique.
Internet cases involving "on-line" injuries, such as intellectual property infringement, defamation, and breach of contract have proliferated as the popularity of the Internet for communications and commerce has expanded. At this stage in the development of the Internet, a primary emerging issue is the exercise of personal jurisdiction over non-resident defendants. See, e.g., CompuServe, Inc. v. Patterson, 89 F.3d 1257 (6th Cir.1996); Blumenthal v. Drudge, 992 F.Supp. 44 (D.D.C.1998); TELCO Communications v. An Apple A Day, 977 F.Supp. 404 (E.D.Va.1997); EDIAS *864 Software Int'l, L.L.C. v. BASIS Int'l Ltd., 947 F.Supp. 413 (D.Ariz.1996); National Petroleum Mktg., Inc. v. Phoenix Fuel Co., 902 F.Supp. 1459 (D.Utah 1995).
As the case law expands, so has the commentary. While some articles suggest that traditional personal jurisdiction analysis is readily adaptable to these Internet injury cases, see, e.g., Richard S. Zembeck, Comment, Jurisdiction and the Internet: Fundamental Fairness in the Networked World of Cyberspace, 6 Alb. L.J. Sci. & Tech. 339, 367 (1996), others suggest that the nature of the Internet may require a modified analysis to avoid arbitrariness so as to advance the notion of reasonable foreseeability. See, e.g., Donnie L. Kidd, Jr., Note, Casting the Net: Another Confusing Analysis of Personal Jurisdiction and Internet Contacts in Telco Communications v. An Apple A Day, 32 U. Rich. L.Rev. 505, 533-543 (March 1998); Sam Puathasnanon, Note and Comment, Cyberspace and Personal Jurisdiction: The Problem of Using Internet Contacts to Establish Minimum Contacts, 31 Loy. L.A. L.Rev. 691 (January 1998).
We, like Judge Fuentes, have canvassed the law on the issue of personal jurisdiction of defamation claims based on electronic communications.[6] We concur with Judge Fuentes' synthesis of the current state of the law:
The common thread that runs through each of the reported decisions is that non-resident defendants may be subject to personal jurisdiction solely on the basis of their electronic contacts only when they specifically direct their activities at the forum, the plaintiff is a resident of the forum, and the brunt of the injury is felt in the forum state.
Stated differently, we, like Judge Fuentes, have located no case in which a court has found personal jurisdiction over a non-resident defendant for allegedly defamatory remarks communicated electronically when the plaintiff did not reside in the forum state, plaintiff's employment was not based in the forum state, and defendant's electronically transmitted remarks were not specifically targeted at the forum state. Indeed, to do so would go beyond the outer limits of due process. Calder, supra; Keeton, supra.
Our research has revealed only two cases in which a court has declined jurisdiction of a non-resident individual or corporate defendant which has used the Internet, e-mail, and computer bulletin boards or forums to make defamatory statements. See Barrett v. Catacombs Press, 44 F.Supp.2d 717 (E.D.Pa.1999); National Petroleum, supra. However, in each case in which jurisdiction has been asserted over non-resident defendants the defamatory communication was specifically targeted at the state in which the plaintiff resided or conducted business activities.
For example, in CompuServe, supra, CompuServe, a computer network provider, commenced a declaratory judgment action in Ohio against an individual residing and doing business in Texas. CompuServe sought a declaratory judgment that it had not infringed Patterson's common law copyrights or otherwise engaged in unfair competition.[7] Patterson was a CompuServe subscriber and had posted several Internet navigator programs designed by him on the CompuServe network. When CompuServe began to market an Internet Navigator of its own, Patterson informed CompuServe that its efforts infringed his *865 trademarks. After Patterson demanded at least $100,000 to settle his claims, CompuServe commenced its declaratory judgment action.
The district court concluded that Patterson's links to Ohio were too attenuated to support personal jurisdiction of him. CompuServe, supra, 89 F.3d at 1261. The Court of Appeals disagreed and reversed. Id. at 1262-69.
The Court of Appeals noted that in reviewing personal jurisdiction issues federal courts must determine whether the defendant is amenable to suit under the forum state's long-arm jurisdiction statute and then determine whether due process requirements of the United States Constitution have been met. Id. at 1262. The Court of Appeals also noted that personal jurisdiction over Patterson would be specific rather than general. Id. at 1263. In determining whether the defendant had sufficient contacts with Ohio to satisfy the traditional notions of fair play and substantial justice, the Court of Appeals emphasized that the plaintiff must show that the defendant purposefully availed himself of the privilege of acting in or causing a consequence in Ohio, that the cause of action arises from these activities, and that the acts of the defendant or the consequences caused by defendant must have a substantial enough connection with the forum. Ibid.
Following a plenary review of the record of the personal jurisdiction issue,[8] the Court of Appeals concluded that Patterson knowingly made an effort and purposefully contracted to market a product in other states through Ohio-based CompuServe acting as his distributor. Therefore, it was reasonable to subject Patterson to suit in Ohio. Id. at 1268. In dicta, however, the Court of Appeals stated that "merely entering into a contract with CompuServe would not, without more, establish that Patterson had minimum contacts with Ohio.... By the same token, Patterson's injection of his software product into the stream of commerce, without more, would be at best a dubious ground for jurisdiction." Id. at 1265 (citations omitted).
In Blumenthal, supra, the plaintiffs alleged they had been defamed by statements made in defendant's electronic gossip column called the Drudge Report. Although Drudge was a California resident who wrote, published, and disseminated the column from Los Angeles, the court found personal jurisdiction was appropriate where the web site was interactive, and the subject matter of the web site was political gossip and rumor directly related to the Washington, D.C. political world accessed by many District of Columbia users, and specifically targeted persons who worked and lived in the District. Blumenthal, supra, 992 F.Supp. at 56-57. Similarly, in TELCO Communications, supra, 977 F.Supp. at 405-08, the court found that the due process clause would not be offended by the exercise of personal jurisdiction in Virginia over a Missouri corporation that had posted on the Internet two press releases allegedly defaming a Virginia corporation. The court noted that the corporate defendant was deliberately advertising itself and soliciting business on a continuous basis in Virginia. Id. at 406.
Furthermore, in EDIAS Software Int'l, supra, plaintiff complained that e-mail messages sent by defendant corporation were defamatory. The court found personal jurisdiction of the non-resident corporate defendant based solely on the e-mail messages and a web site accessible to Arizona customers. EDIAS Software Int'l, supra, 947 F.Supp. at 420. Notably, *866 however, plaintiff filed its complaint in the forum in which it conducted business, and to which defendant's employees regularly visited and sent telephone, facsimile and e-mail messages to plaintiff's employees. Thus, the court also recognized that it had personal jurisdiction of the defendant corporation under the effects test in Calder because plaintiff's principal place of business was in Arizona and it was foreseeable that its statements might deter potential customers from dealing with plaintiff. Ibid. See also California Software, Inc. v. Reliability Research, Inc., 631 F.Supp. 1356 (C.D.Cal.1986) (personal jurisdiction of non-resident corporate defendant appropriate in California when its messages posted on a computer bulletin board were designed to harm the business prospects of resident plaintiff corporation).
Barrett, supra, and National Petroleum Mktg., supra, are the only cases we have located which declined to recognize personal jurisdiction of a non-resident defendant which communicated allegedly defamatory remarks by electronic means. However, the circumstances of each case support the conclusion that the exercise of personal jurisdiction over the non-resident individuals in this case exceeds the outer limits of due process.
In National Petroleum Mktg., plaintiff was a Nevada corporation involved in refining, buying and selling petroleum products, with its principal place of business in Utah. The defendants were a rival Arizona corporation and its chief officers, and a Maryland company that provided specialized oil industry information, its officers, editors, and news reporter. National Petroleum Mktg., supra, 902 F.Supp. at 1462-63. No individual defendant was a Utah resident and none of the defendants owned property or conducted any business in Utah. Ibid.
The alleged defamatory statements were contained in an article published by the Maryland company on a computer bulletin for the oil industry, transmitted over a private satellite system and passively received by subscribers. Id. at 1462-64. The claim against the Arizona defendants was based solely on communications made from Arizona to the reporter in New Jersey when the reporter was researching the article. Id. at 1467. At least two of the plaintiff's Utah customers subscribed to the service and, additionally, in direct response to the article two of the plaintiff's key suppliers terminated its credit lines. Id. at 1465.
The court found that personal jurisdiction existed over the Maryland company and over the reporter who researched, authored, and edited the article, even though she apparently made only a single telephone call to a Utah source. Id. at 1463, 1469-70. The reporter had intentionally contacted the forum and the company had intentionally sent the article into the forum and thus both could reasonably foresee being haled into court in Utah. Id. at 1471.
However, the court held that the contacts of the Arizona defendants were insufficient to establish personal jurisdiction even under the "relaxed minimum contacts standards" applicable to libel actions. Id. at 1468. The communications were neither initiated nor received in Utah. Id. at 1467. Furthermore, the Arizona defendants had no control over the article's publication in Utah. Id. at 1468. Similarly, the court found no jurisdiction existed over those individual defendants who were employees of the Maryland company, but had no responsibility for or knowledge of the article until after distribution. Id. at 1469.
Finally, in Barrett v. Catacombs Press, 44 F.Supp.2d 717 (E.D.Pa.1999), the court held that it lacked jurisdiction over a non-resident defendant whose alleged defamatory statement concerning plaintiff's views on fluoridation appeared on two informational web sites maintained by her. The court characterized these web sites as passive. Id. at 197, 730 A.2d at 859.
Following a review of cases involving personal jurisdiction questions involving Internet activity, the motion judge observed *867 some activity in the forum state was required beyond the maintenance of an informational web site accessible to forum residents. Id. at 197 - 98, 730 A.2d at 859-60. The court emphasized that the fact that the information is accessible is not synonymous with purposeful activity in the forum. Id. at 197, 730 A.2d at 859. Finding no evidence that the allegedly defamatory remarks deliberately or knowingly targeted Pennsylvania residents, the court refused to exercise jurisdiction over the non-resident defendant. Id. at 201 - 02, 730 A.2d at 861-62.
Here, the allegedly defamatory remarks were posted on a closed network available solely to Continental flight crews. To be sure, the messages or threads posted on the network are available to be read by any crew member who uses the Forum, however, there is nothing in this record to suggest that the remarks were specifically targeted at this state or were calculated to produce identifiable harm to plaintiff in this state. Plaintiff has never resided in New Jersey, and none of the non-resident defendants have ever resided here. None have ever been based in New Jersey. Plaintiff was based in Newark for five years but her base had been transferred to Houston in January 1993, at least two years before the first allegedly defamatory thread was posted. Admittedly, plaintiff's residence in this state is not a separate jurisdictional requirement and lack of residence will not defeat jurisdiction on non-resident defendants based on their activities within the forum. Keeton, supra, 465 U.S. at 780, 104 S.Ct. at 1481, 79 L.Ed.2d at 801. However, unlike in Calder and Keeton, we have no evidence that the non-resident defendants continuously and deliberately directed their comments to this state or caused any identifiable harm in this state. The act of posting a message on the Forum's electronic bulletin board to which access is restricted to a defined and relatively small group and is further restricted by personal choice, purchase of equipment and payment of a fee is not an act purposefully or foreseeably aimed at this state. There is no nationwide jurisdiction for defamation actions, McFarlane v. Esquire Magazine, 74 F.3d 1296, 1300 (D.C.Cir.), cert. denied, 519 U.S. 809, 117 S.Ct. 53, 136 L.Ed.2d 16 (1996), and the advent of the Internet and electronic bulletin boards such as the Forum does not change that fact. Mallinckrodt Med., supra, 989 F.Supp. at 273.
Thus we, like Judge Fuentes, conclude that the connection between the non-resident defendants and this state is too attenuated to sustain personal jurisdiction.

II
Plaintiff argues that the court erroneously dismissed her defamation claim against Continental based on its employees' actions because Continental was liable under the doctrine of respondeat superior. She asserts that in light of the unusual employment environment of a Continental pilot that required extensive use of the CMS and Continental's control of the CMS, use of the system was within the scope of the individual defendants' employment and thus Continental is liable to plaintiff for her injuries resulting from the pilot/defendants' defamatory statements published on its CMS. According to plaintiff, Continental's control of the system was evidenced by the nature of Continental's publications on the system including the pilot's schedules, Continental policies, and trip bidding information. Plaintiff also argues that the remarks were defamatory, but, for purposes of his analysis, Judge Fuentes had accepted the defamatory nature of the remarks and thus that issue is not before this court.
Continental argues that it was not liable for the employees' comments and the comments were not made within the scope of the pilots' employment because the pilots did not use the Forum to perform their job duties. Rather, Continental asserts the Forum was separate and distinct from the crew assignment system and was neither accessible to nor controlled by Continental. *868 Thus, Continental had no duty to monitor the system. Further, the comments were made during the pilots' personal time, at their expense, and did not further Continental's interests.
Given that the claims against the non-resident defendants were dismissed on the basis of lack of personal jurisdiction, Judge Fuentes only considered Continental's vicarious liability in regard to Abdu. He found that "Abdu's comments were not made within the authorized time and space limits of his job. The allegedly defamatory statements could have only been made via an employee's personal computer, only at that employee's personal expense, and only during that employee's free time." He acknowledged plaintiff's argument that an employee's use of an employer's machinery or other instrumentality created a rebuttable presumption that the employee was acting within the scope of employment. However, he stated that "[t]his instrumentality ownership issue ... is irrelevant in this case because the Forum, as part of the System, was not used within the scope of Abdu's employment." He found that use of the Forum had "no relation to performing any of a pilot's duties." We agree.
In Printing Mart-Morristown v. Sharp Elec. Corp., 116 N.J. 739, 771, 563 A.2d 31 (1989), the Court recognized that an employer may be liable for defamatory statements of its employees as long as the employee was acting within the scope of his or her employment when they made the statements. An employee was acting within the scope of employment if the action was "`of the kind'" he or she was employed to perform; the action occurred "`substantially within the authorized time and space limits;'" and was triggered, "`at least in part, by a purpose to serve the master.'" Ibid. (quoting Di Cosala v. Kay, 91 N.J. 159, 169, 450 A.2d 508 (1982)).
Plaintiff's entire argument rests on her assertions that in publishing the defamatory statements "[t]he pilots were using Continental's Crew Management System" and the "use of the System is one of the duties that they are employed to perform." However, plaintiff's repeated references to the CMS and the functions Continental performed on the CMS fail to acknowledge the unrebutted factual record that the CMS and Forum were two entirely different systems. While Continental provided pilots with the means to access the CMS, utilized that system to convey important information necessary for the pilots' performance of their jobs, and relied on its pilots to use the CMS for a variety of purposes, no such evidence was presented with regard to the Forum. Indeed, the record demonstrates that Continental did not require employees to utilize the Forum. Stated differently, the decision to use the Forum rests solely with the employee, and the employee, not Continental, bears the cost of any use. Regardless of whether the threads were defamatory, plaintiff has established no basis for Continental's liability under the doctrine of respondeat superior.

III
Plaintiff also argues that Judge Vazquez, who handled the final motion in this case, erroneously concluded that the Forum did not constitute a "workplace" for purposes of the LAD, thus dismissing her LAD claim against Continental. She argues that acts of harassment that take place outside the workplace are actionable if they arise from the working relationship and, furthermore, the Forum was part of Continental's workplace because the computer system was made available by Continental; the CMS was used by Continental employees to obtain employment-related information; Continental received three percent of the monies paid to CompuServe by its employees; access was limited to Continental's employees; and the system was monitored and regulated by Continental employees. She asserts that the Forum "is analogous to a bulletin board placed in a pilot's lounge. Pilots are not *869 required to the lounge [sic], but in the lounge they can look at the bulletin and obtain their schedules and other work-related information."
In his written opinion, Judge Vazquez stated:
Under certain circumstances, this Court does not doubt that the internet could be a workplace. Here, Continental had no control over the Forum, did not make it a requirement of its employees to use the Forum, and employees had to pay a service fee to CompuServe and have their own computers to access it.
This Court, therefore, finds that the Forum is not a workplace for purposes of a hostile work environment under the New Jersey Law Against Discrimination. Further, this Court finds that Continental cannot be held negligently liable for the threads that appeared on this Forum as Continental has no duty to police the internet to control its employees['] activity in a nonworkplace.
The judge did not address whether defendants' actions constituted sexual harassment.
Under the LAD, it is an unlawful employment practice for an employer to discriminate in conditions of employment. N.J.S.A. 10:5-12. The Supreme Court has determined that sexual harassment creating a hostile work environment amounts to discriminatory conduct prohibited by the LAD. Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 592, 626 A.2d 445 (1993). But, there can be no employer liability for sexual harassment in the absence of a showing that the harassing employee was acting within the scope of his employment, or that the employer was negligent, or had intended the conduct. Id. at 619-21, 626 A.2d 445. Moreover, under any of the above theories, an employer's liability for sexual harassment is predicated on the harassing employee's supervisory status and his consequential status as the employer's agent, id. at 618-19, 626 A.2d 445, or if supervisors knew or should have known of the harassment campaign and allowed it to continue. Heitzman v. Monmouth County, 321 N.J.Super. 133, 149, 728 A.2d 297 (App.Div.1999). See also Hunter v. Allis-Chalmers Corp., 797 F.2d 1417, 1421 (7th Cir.1986). Vicarious liability for sexual harassment may be established where the employer delegated authority to the supervisor to control the situation of which the plaintiff complained; the supervisor's exercise of that authority resulted in a violation of the LAD; and the delegated authority aided the supervisor in injuring the plaintiff. Lehmann, supra, 132 N.J. at 620, 626 A.2d 445.
In this case, no evidence suggests that any individual defendant was plaintiff's supervisor or invoked any authority delegated by Continental to perpetuate harassment of plaintiff through the Forum. Nor does any evidence suggest that Continental had any direct authority over the Forum such that it could inspect or police the information posted.
Plaintiff argues that harassment outside the workplace is actionable under the LAD, pointing to an observation in the New Jersey Supreme Court's opinion in American Motorists Ins. Co. v. L-C-A Sales Co., 155 N.J. 29, 42, 713 A.2d 1007 (1998). There the Court "note[d] that whether specific acts of harassment or discrimination took place outside the workplace, such as harassing telephone calls to [the worker's] home, is of no consequence because such conduct nevertheless would have arisen out of the employment relationship between [the worker] and LCA." Ibid. But the sole issue before the Court was whether the "employee exclusion" in a corporation's general liability insurance policy precluded coverage for damages arising from a wrongful termination claim. Id. at 31, 713 A.2d 1007. The Court found that it did, and the employer was unable to obtain coverage for the damages incurred. Id. at 41, 713 A.2d 1007. That determination, however, offers no suggestion that sexually harassing behavior by non-supervisory employees occurring solely outside *870 the workplace may provide a cause of action against the employer under the LAD. Thus, Judge Vazquez properly dismissed this claim.
Finally, plaintiff's argument that Judge Fuentes erred when he dismissed the business libel and intentional infliction of emotional distress claims against Continental is without merit. R. 2:11-3(e)(1)(E). These claims are premised on Continental's vicarious liability for the defamatory statements of the individual defendants. Having concluded that the alleged defamatory statements were communicated by a means over which Continental exercised no control, these claims were properly dismissed.
Affirmed.
NOTES
[1] Jensen had not filed a motion to dismiss or joined the motion filed by the other non-resident defendants. The consent order acknowledged that Judge Fuentes' opinion was applicable to him.
[2] All claims against defendant Abdu were dismissed on March 20, 1998. Plaintiff does not appeal this order.
[3] Defendant Riggs is a male.
[4] The meaning of "PC's" in this context is unclear from the record.
[5] The meanings of these alphabetical references are not identified in the record.
[6] On-line patent and trademark claims have also proliferated. See, e.g., Mallinckrodt Med., Inc. v. Sonus Pharm., Inc., 989 F.Supp. 265 (D.D.C.1998); American Network, Inc. v. Access Am./Connect Atlanta, Inc., 975 F.Supp. 494 (S.D.N.Y.1997); Bensusan Restaurant Corp. v. King, 937 F.Supp. 295 (S.D.N.Y. 1996), aff'd, 126 F.3d 25 (2d Cir.1997). Although these cases are instructive, the on-line defamation cases are more pertinent to the claims presented by plaintiff.
[7] Although CompuServe is a copyright infringement and unfair competition case, we discuss it at length because it has been relied on and referenced by many courts in their analyses of on-line defamation claims.
[8] Federal appellate tribunals conduct a plenary review of personal jurisdiction issues. Id. at 1261; Reynolds v. Int'l Amateur Athletic Fed'n, 23 F.3d 1110, 1117 (6th Cir.), cert. denied, 513 U.S. 962, 115 S.Ct. 423, 130 L.Ed.2d 338 (1994). On the other hand, this court will not disturb factual findings and legal conclusions unless they are manifestly unsupported by or are inconsistent with the competent, relevant and reasonably credible evidence. Jacobs, supra, 309 N.J.Super. at 452, 707 A.2d 477.